903 P.2d 1107

**Eleanor DUNCAN, Plaintiff–Appellee,**

v.

**ST. JOSEPH'S HOSPITAL AND MEDI-CAL CENTER, an Arizona non-profit corporation, Defendant–Appellant.**

No. 1 CA–CV 92–0479.

Court of Appeals of Arizona, Division 1, Department C.

Sept. 14, 1995.

* *NOTE:* Retired Judge Levi R. Haire was authorized to participate in this appeal by order of the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. art. 6, § 20, and A.R.S. § 38–813.

Bryan Cave by Neil Vincent Wake, Steven E. Noack, and Jennings, Strouss & Salmon, P.L.C. by Gerald W. Alston, Phoenix, for defendant-appellant.

Marton & Hall, P.A. by Kraig J. Marton, Phoenix, for plaintiff-appellee.

## OPINION

EHRLICH, Judge.

In this appeal, we consider whether Eleanor Duncan, a former employee of St. Joseph's Hospital and Medical Center ("hospital"), presented sufficient evidence that her at-will employment status was altered, thereby entitling her to a reasonable time in which to perform as director of ambulatory services and prohibiting her termination from that position except for good cause. Because we conclude that the evidence was insufficient, the trial court erred in denying the hospital's motion for directed verdict or for judgment notwithstanding the verdict.

## FACTS [1] AND PROCEDURAL HISTORY

Duncan was hired by the hospital in 1981 as a nursing administrator. She had bachelor's and master's degrees in nursing, and had worked as vice-president of nursing at a hospital in St. Paul, as the administrative director of patient-care services at a hospital in Nashville, and as an instructor at two nursing schools.

In 1986, the hospital promoted Duncan to senior vice-president for patient-care services. By December 1988, she was one of five vice-presidents, supervising more departments (30) and employees (1200–1400) than any other vice-president.

In January 1989, Joseph DeSilva became the hospital's president and chief executive officer. When he was hired, the hospital was

---

1. The facts and all reasonable inferences therefrom are viewed in a light most favorable to Duncan, the party who opposed the hospital's motion for directed verdict. *E.g., Rocky Mountain Fire and Cas. Co. v. Biddulph Oldsmobile,* 131 Ariz. 289, 292, 640 P.2d 851, 854 (1982).

losing money and, in his words, it was "relatively disjointed and disorganized with respect to management roles and responsibilities and accountabilities." DeSilva reorganized the hospital's management, which included eliminating Duncan's position. Instead, he created a new position of vice-president of nursing, and he wanted the candidate to have a Ph.D. in nursing, a national reputation and experience in a "magnet" institution. Duncan did not possess these qualifications.

In April 1989, DeSilva told Duncan that her position would be eliminated and that applicants for vice-president of nursing would be solicited nationally. Not wanting Duncan to leave the hospital, however, DeSilva offered her the new position of director of ambulatory services, the exact duties of which had not been defined, by letter dated May 25, 1989. The letter reads in relevant part:

> As we have previously discussed, your current position of Senior Vice President—Patient Care Services is being eliminated. Two new positions will be created on or before October 1, 1989. The new positions will be Vice President—Nursing and Director of Ambulatory Services. As envisioned, I believe these new positions will best meet St. Joseph's initiatives as well as the strategic direction for ambulatory services over the next several years.

> This letter is to formally offer you the position of Director of Ambulatory Services. This position will report directly to me as CEO until such time as a new reporting relationship is determined appropriate.

> &ast; &ast; &ast; &ast; &ast; &ast;

> I recognize that this position does not have the span and scope of responsibilities of your current position, however, it will be a key administrative position at St. Joseph's and it has potential for future growth and development based on level of performance and need. In addition, we will have an opportunity to work together to refine the nature and scope of the job.

> &ast; &ast; &ast; &ast; &ast; &ast;

> This offer will remain open to you for a period of 10 working days from the date of this letter. If you elect not to accept this offer, you are welcome to apply for the Vice President—Nursing position and be considered along with any other candidates that may apply for that position. However, there will be no guarantee that the Director of Ambulatory Services position will be available to you in the event you are not selected for the Vice President—Nursing position.

Duncan was offered a salary of $63,700 per year, approximately $10,000 less than she had been earning. In a letter dated June 5, 1989, Duncan accepted the position, writing that she "expect[ed] to work many more years at St. Joseph's."

In September 1989, DeSilva distributed an organizational chart listing the five areas to be supervised by the director of ambulatory services. In return, Duncan presented to DeSilva a proposal identifying 14 areas, including the five previously specified, over which she wished to assume responsibility. In a November 3, 1989, letter to Duncan regarding her assumption of the new position effective ten days later, DeSilva wrote:

> As envisioned, I believe this new position—Director of Ambulatory Services—will best meet St. Joseph's initiatives as well as the strategic direction of Ambulatory Services over the next few years. It is my hope that in assuming this position you will demonstrate vigor and enthusiasm in accomplishing our initiative.

As the director of ambulatory services, Duncan was assigned supervisory responsibility for four departments—the Menninger Clinic, outpatient surgery, Optifast and the employee assistance program. In a February 1990 memorandum to Thomas Zenty, the new chief operating officer to whom Duncan now reported, Duncan indicated that she had expected to assume administrative responsibility for all ambulatory services at the hospital, including ten other areas, but she received no additional duties.

In April 1990, Zenty told Duncan that she was neither sufficiently assertive nor qualified for a staff position. Two months later, he informed her that the position of vice-

president of ambulatory services would be created but that she would not be named to this position. Instead, Zenty offered Duncan the post of nursing manager of the mental-health program with no salary decrease. In the June 6, 1990, letter offering Duncan this position, Zenty wrote that, if she did not accept, she was "welcome to apply for any other vacant position" for which she was qualified or that she could elect a described severance package.

Duncan was reluctant to accept the position because she did not want to report to the vice-president of nursing and she believed that the position required certain clinical expertise which she lacked. When Duncan failed to respond to Zenty's written offer by the expiration date, he sent her a telegram advising her that he expected her to report to work as the manager for mental-health services on June 25, 1990.

Duncan did not report on June 25, 1990. Instead, she and Zenty met to discuss her concerns regarding the position. In a confirmation letter of the same date, Zenty wrote of the need for Duncan to accept either the offer or the severance package. He added that he could not "hold the position ... open, not knowing" her answer "or alternatively," he could not "force [her] to accept the severance package that ha[d] been offered...." Zenty continued that, if Duncan refused to let him know whether she accepted the position and neither rejected nor accepted the severance package, "this can only result in your employment being terminated." He added that he would be willing to treat her refusal to make a decision as a voluntary resignation.

On June 29, 1990, Zenty, the hospital's attorney and Duncan's attorney met to revise the job description of the position last offered to Duncan. As a result, Duncan was offered the position of administrative program director of the Menninger–Phoenix program. She, however, refused by letter dated July 2, 1990, because (1) it was several management levels below the position originally proposed by DeSilva; (2) she had not been given the director position as offered; (3) the new position was comparable only to that of head nurse; (4) she believed that she lacked the requisite clinical expertise and (5) given her previous status at the hospital, the position would be demoralizing and humiliating. She closed by stating that she did not wish to resign and urged Zenty to offer her a position commensurate with her education and skills that would not humiliate her. Although no one at the hospital had told her to vacate her office, Duncan permanently did by June 22, 1990.

Shortly thereafter, Duncan sued the hospital for breach of contract, express and implied, promissory estoppel and the tort of bad faith. Specifically as to the claim for breach of an implied contract, Duncan alleged that, because of oral discussions with DeSilva and the letters dated May 25, 1989, and June 5, 1989, she and the hospital had an implied contract that she would have a reasonable amount of time in which to perform as the director of ambulatory services and that she would not be terminated except for good cause. Duncan further claimed that the hospital breached this implied contract because minimal responsibility had been transferred to her and she later was told that she would not be the director of ambulatory services.

Prior to trial, the trial court granted the hospital's motion for partial summary judgment and dismissed the tort claim. However, it denied the hospital's similar motion on Duncan's contract claims. Citing *Leikvold v. Valley View Comm. Hosp.*, 141 Ariz. 544, 688 P.2d 170 (1984), and *Wagner v. City of Globe*, 150 Ariz. 82, 722 P.2d 250 (1986), the court concluded:

> The dispute centers around two letters from Joseph J. DeSilva, dated May 25, 1989 and November 3, 1989 that arguably create the inference that the new position for which [Duncan] was hired was to last "the next several years" or "over the next few years." It is the view of this Court that since these terms can reasonably be construed in more than one manner, the language is ambiguous and its construction is a question for the jury.

The hospital's defense at trial was that all of its employees, including Duncan, had employment contracts which were terminable at will. Near the conclusion of the trial, it

moved for a directed verdict, asserting that there was no evidence that it had altered the at-will relationship with Duncan by promising her employment for a specific duration. It elaborated that neither its conduct nor policies overrode a disclaimer in its employee handbook that all hospital employment was at will. Alternatively, it claimed that Duncan was not terminated. The court denied the motion with respect to the breach of contract claims but directed a verdict in the hospital's favor on Duncan's claim of promissory estoppel.

The jury specifically found in favor of Duncan on an implied term of employment and concluded that her damages were $445,900. Claiming that the verdict was contrary to law and not justified by the evidence presented, the hospital moved for judgment notwithstanding the verdict or a new trial. Denying the motion, the trial court entered judgment in the jury's amount and awarded Duncan attorneys' fees of $70,137 and costs of $5736.30. The hospital timely appealed.

## DISCUSSION

■ The hospital argues that the trial evidence was insufficient to support a verdict for the existence and breach of implied terms of employment. A trial court should direct a verdict or enter judgment notwithstanding the verdict only if there has been no evidence that would justify a reasonable person returning a verdict for the opposing party. *Orme School v. Reeves,* 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990); *Times Mirror Co. v. Sisk,* 122 Ariz. 174, 178, 593 P.2d 924, 928 (App.1978). In other words, a motion for directed verdict or one for judgment notwithstanding the verdict is properly granted if, as a matter of law, the result is the only one that could be reached. *Baich v. Campbell,* 164 Ariz. 197, 199, 791 P.2d 1080, 1082 (App. 1990).

■ The general rule is that an employment agreement of indefinite duration is presumed to be terminable at will by either party with or without cause. *E.g., Wagenseller v. Scottsdale Mem. Hosp.,* 147 Ariz. 370, 375–76, 710 P.2d 1025, 1030–31 (1985). Because the at-will relationship is contractual, however, the parties can modify that presumption. *Wagner,* 150 Ariz. at 85, 86, 722 P.2d at 253, 254. Thus, as Duncan argues, Arizona courts also have recognized qualifications on an employer's right to discharge an employee in such a situation, one of which limitations "requires proof of an implied-in-fact promise of employment for a specific duration, as found in the circumstances surrounding the employment relationship, including assurances of job security in company personnel manuals or memoranda." *Wagenseller,* 147 Ariz. at 376, 710 P.2d at 1031; *see Wagner,* 150 Ariz. at 85, 722 P.2d at 253. For example, an employer's policy statements in its personnel manual on such topics as job security and disciplinary procedures may, by the parties' conduct, become part of the at-will agreement. *Wagenseller,* 147 Ariz. at 381, 710 P.2d at 1036; *see also Leikvold,* 141 Ariz. at 546, 688 P.2d at 172. Whether there is a promise of job security implied in fact, by use of a personnel manual or otherwise, is a question of fact, *e.g., Wagenseller,* 147 Ariz. at 383, 710 P.2d at 1038; *Wagner,* 150 Ariz. at 86, 722 P.2d at 254, resolution of which depends on evidence such as the language contained in the personnel manual, and the employer's conduct and oral representations regarding the manual. *Leikvold,* 141 Ariz. at 548, 688 P.2d at 174.

■ We now turn to the present matter and whether reasonable jurors could have concluded that there was an implied-in-fact agreement that Duncan would have a reasonable time in which to perform as director of ambulatory services and that she could only be terminated for cause. There is nothing in the record which suggests that Duncan's employment with the hospital was for anything but an indefinite duration. Consequently, there is a presumption that she was terminable at any time with or without cause. *E.g., Wagenseller,* 147 Ariz. at 375–76, 710 P.2d at 1030–31. The issue thus is whether this presumption has been refuted.

### 1. Hospital's Employee Handbook

■ Duncan argues that the hospital's employee handbook modified the postulate that she could be fired without cause. The hospital contends that, as a matter of law, the

clear and conspicuous language of a disclaimer in the opening of its employee handbook precluded any terms of that handbook from modifying Duncan's presumptively at-will employment relationship by instilling in her any reasonable expectations of job security. It maintains that the trial court erred in instructing the jury that it could consider the handbook as possibly altering Duncan's at-will employment status.[2]

Duncan responds that any expectation of an at-will relationship was removed, at least in part, by the written assurances of job security contained in the philosophy of the hospital's founding Sisters of Mercy and the hospital's Performance Improvement Plan, both included in the hospital's handbook. She maintains that the disclaimer contained in the 1988 version of the handbook[3] does not insulate the hospital from liability.

At trial, the hospital offered its two-volume employee handbook.[4] The first page of part one of the handbook and the inside cover of part two contain the following statement:

> This handbook, and the rules and policies set forth in it, do not constitute an employment contract. Employment at St. Joseph's is "at will"—which means that employment here is voluntary, both for you and for the Hospital. Either you or the Hospital may terminate the relationship at any time, with or without cause. Your work at St. Joseph's shall be free from any contracts or promises, written or oral,

which may have induced you to come with us or to stay with us. [Emphasis added.]

\* \* \* \* \* \*

> ... In the event that the actual terms and provisions of policies, procedures or benefit plans appear to be in conflict with any information given in this handbook, the Hospital's interpretation thereof will govern.

The handbook contains the hospital's rules and regulations, and that "a single deliberate violation may be regarded as sufficient reason for termination of employment." Also incorporated is an explanation of the "Performance Improvement Program" which guides supervisors in dealing with employee performance problems; this program was more fully detailed in a separate document describing procedures for the discharge of employees for work-performance problems.[5] The Sisters of Mercy Philosophy Statement added, in relevant part, that the nuns believe "in a climate of mutual support, compassion, care and justice for those serving within [the hospital]."

The hospital's disclaimer is similar to those in two cases in which the United States District Court for the District of Arizona applied Arizona law to an employment issue nearly identical to that in the present case. In *Chambers v. Valley Nat'l Bank of Arizona*, 721 F.Supp. 1128 (D.Ariz.1988), the employee claimed that the bank could only

---

2. The jury was instructed in relevant part as follows:

> In the second count of her lawsuit, [Duncan] claims that it was an implied term of employment that, number one, she could only be terminated for good cause; and two, she would have a reasonable time to perform in the position of director of ambulatory services.
> Implied terms are not based upon express promises but mean terms that are inferred from the statements or conduct of the parties. It is for you to decide whether such terms are to be inferred.
> In deciding you may consider the language of any personnel manual or personnel policy and any representations made by the employer in the course of dealing between the employer and the employee.

3. By mentioning the year (1988) of the handbook at issue and that she had no idea what was in any prior handbooks, Duncan seems to imply

that the handbook's relative newness somehow minimizes the significance of the disclaimer contained within. A similar argument was rejected in *Chambers v. Valley Nat'l Bank of Arizona*, 721 F.Supp. 1128, 1131–32 (D.Ariz.1988). There, the court stated that, because employment contracts can be modified at any time, employers were not precluded from having disclaimers become part of an implied-in-fact contract of employment. *Id.* at 1131.

4. The first part contains the hospital's personnel policies and procedures; the second includes information on benefits and compensation.

5. Although policy and procedure provisions for the Performance Improvement Program also appear in a document separate from the employee handbook, this document is not part of Duncan's employment contract because it merely details the procedures which carry out the program that is provided for in the handbook.

terminate her for cause because its personnel policy manual and handbook created an implied-in-fact employment contract. The bank's handbook prominently included the following introductory paragraph:

> [T]he contents of this handbook DO NOT CONSTITUTE THE TERMS OF A CONTRACT OF EMPLOYMENT. Nothing contained in this handbook should be construed as a guarantee of continued employment, but rather, employment with the Bank is on an "at will" basis. This means that the employment relationship may be terminated at any time by either the employee or the Bank for any reason not expressly prohibited by law.

*Id.* at 1131. Despite Chambers' insistence that the "boilerplate disclaimer" should not prevent the handbook and manual from becoming part of the employment contract because the language was added 14 years after she was hired, *id.*, the court concluded that the addition of the disclaimer to the handbook modified the unilateral employment contract. It further determined that the handbook did not become part of the employment contract and thus did not limit the bank's ability to terminate employees at will. *Id.* at 1132.

In *Thomas v. Garrett Corp.*, 744 F.Supp. 199 (D.Ariz.1989), *aff'd*, 904 F.2d 41 (9th Cir.), *cert. denied*, 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 525 (1990), a laid-off employee contended that the employee handbook supplemented an at-will employment agreement which the employer breached because the layoff was executed contrary to the stated policies and procedures. The handbook also contained the following disclaimer:

> Your employment at Garrett is voluntarily entered into, and you are free to resign at any time. Similarly, Garrett may terminate the employment relationship where it believes it is in the Company's best interest. Neither this Handbook nor any other communication by a managerial representative is intended in any way to create a contract of permanent employment. However, all members of management are dedicated to ensuring that discipline, including dismissal, is administered in a consistent and equal manner.

*Id.* at 201. The court concluded that the disclaimer clearly notified employees that their employment was terminable at will and that the handbook neither created a contract of permanent employment, modified the terms of employment nor instilled any reasonable expectations of job security. *Id.* The court observed that the last sentence of the disclaimer did not indicate any modification of the at-will relationship. *Id.* at 201. Because there was no material issue of fact as to whether the handbook became part of the employment agreement, the court granted summary judgment for the employer. *Id.*

As the quotation below illustrates, the Arizona Supreme Court has cautioned that not all personnel manuals become part of the employment contract.

> Employers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason. Such actions, either not issuing a personnel manual or issuing one with clear language of limitation, instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual.

*Leikvold*, 141 Ariz. at 548, 688 P.2d at 174.

In the *Leikvold*, *Wagner* and *Wagenseller* cases, there is no indication that the personnel manuals at issue made any declaration as to the at-will nature of the employment relationship let alone that the personnel rules in *Wagner* or the policies setting forth the disciplinary procedures in *Leikvold* or the four-step disciplinary procedure in *Wagenseller* did not constitute an employment contract. Thus, the courts in these cases properly concluded that there were fact questions as to whether such information became part of the agreement.

Two other cases upon which Duncan relies as support for her contention that the hospital handbook disclaimer does not insulate it from liability also are unavailing. In both *Jeski v. American Express Co.*, 147 Ariz. 19, 708 P.2d 110 (App.1985), and *Loffa v. Intel*

*Corp.*, 153 Ariz. 539, 738 P.2d 1146 (App. 1987), this court was not asked to consider whether a personnel manual with an express provision that its contents are not part of the at-will employment contract might limit an employer's authority to terminate an employee. Specifically, in *Jeski*, the complaining employee did not have a formal written employment contract and the personnel manual declared that "employment with American Express Company *can be terminated at any time* by either the Company or [the employee]." 147 Ariz. at 20, 708 P.2d at 111 (emphasis original). However, also in its manual, American Express pledged to provide employees with *"job security."* *Id.* (emphasis original). Because the manual made representations arguably at odds with traditional at-will employment, this court decided that it was ambiguous. Accordingly, it held that whether the manual modified the parties' at-will relationship was a question of fact to be tried.

In *Loffa*, when Loffa began employment with Intel, he signed a one-page "Employment Agreement" which, among other provisions, stated that "[t]his Agreement ... does not in any way restrict my right or the right of INTEL to terminate my employment." 153 Ariz. at 541, 738 P.2d at 1148. The company provided employees with a separate package of materials, including information on employee conduct, the progressive discipline policy and a welcome message claiming that employees of Intel believe that they get a "fair shake." *Id.* at 541–42, 738 P.2d at 1148–49. This court concluded that, because the signed agreement neither referred to the discipline policy nor included an express stipulation that the agreement was the exclusive embodiment of the terms of the contract, the statement in the agreement was not enough to remove from the jury's consideration the effect of Intel's discipline policy on the employment relationship. *Id.* at 544, 738 P.2d at 1151.

In this case, the hospital's employee handbook at the beginning of each of the two parts and under the separate heading of "Your Employee Handbook," unambiguously notifies employees in common language that they are terminable at will and explains what that entails. It further advises hospital personnel that the rules and policies contained therein do not constitute a contract of employment and that, in the event that other provisions of policies, procedures or benefit plans conflict with the handbook's information, the hospital's interpretation governs. Reasonable persons could not find that the hospital's employee handbook, including the philosophy statement and the Performance Improvement Plan, instilled in Duncan any sensible expectations of job security or the belief that she could only be terminated for cause. As a matter of law, the handbook was not part of Duncan's employment contract and the issue whether the policies of the handbook impliedly promised Duncan that her employment no longer was terminable at will was not properly before the jury.

### 2. Other Assurances

While "the presence of disclaiming language in its policies may not absolutely insulate an employer from liability" if contrary written or oral assurances are given to the employee during employment, *Wagner*, 150 Ariz. at 86 n. 5, 722 P.2d at 254 n. 5, the hospital maintains that the express disclaimer also precludes the finding of any other contrary implied-in-fact terms or agreement. It specifically argues that there can be no implied-in-fact contract when there is a contrary express contract between the parties in reference to the same subject matter. On the other hand, Duncan submits that DeSilva's May 25, 1989, letter offering her the position of director of ambulatory care and his letter of November 3, 1989, regarding her assumption of this position plus their pertinent verbal discussions were inconsistent with at-will employment and raised a question of fact as to whether the parties had modified their at-will relationship to the extent that the hospital impliedly had promised Duncan a reasonable time in which to "prove" herself as the director of ambulatory services. She further maintains that there were oral assurances from the hospital's former chief executive officer, the Sisters of Mercy, DeSilva, the hospital's board of directors and "everybody on down," from which she deduced that she only could be terminated for cause.

The Michigan Supreme Court considered in *Rowe v. Montgomery Ward & Co., Inc.,* 437 Mich. 627, 473 N.W.2d 268 (1991), the similar issue of whether certain oral and written statements by the employer created a contract terminable only for cause. Despite Montgomery Ward's written policy on the back of the employee handbook that employment was at-will, a terminated employee contended that written policy statements plus a declaration at her prehiring interview that, as long as she achieved her sales quota, she had a job at Ward's created an employment contract terminable only for cause.

To determine whether a reasonable factfinder could find a promise of job security implied in fact, the court in *Rowe* applied the following objective standard:

> A contract is implied where the intention as to it is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction.

*Id.* 473 N.W.2d at 273 (quoting *Miller v. Stevens,* 224 Mich. 626, 195 N.W. 481 (1923)). In deciding whether there was mutual assent on a provision for permanent employment or if the interview statement was merely a noncontractual expression of "optimistic hope of a long relationship," the court explained that "oral statements of job security must be clear and unequivocal to overcome the presumption of employment at will." It concluded that the employee's evidence was insufficient to permit reasonable jurors to find that a reasonable employee would have interpreted the statements and actions as an implied-in-fact promise of termination only for cause.

The above analysis is equally instructive for written assurances as it is for oral ones. *Rowe* is particularly helpful because the Michigan Supreme Court relied heavily on *Toussaint v. Blue Cross & Blue Shield of Michigan,* 292 N.W.2d 880 (1980), which our supreme court cited with approval in *Leikvold,* 141 Ariz. 544, 688 P.2d 170.

Duncan claims that the following excerpts from DeSilva's two letters indicated that she would be the director of ambulatory services for at least several years.

> As envisioned, I believe these new positions [Vice President—Nursing and Director of Ambulatory Services] will best meet St. Joseph's initiatives as well as the strategic direction for ambulatory services *over the next several years.* [Emphasis added.]

>     \*     \*     \*     \*     \*     \*

> I recognize that this position does not have the span and scope of responsibilities of your current position, however, it will be a key administrative position at St. Joseph's and it *has potential for future growth and development* based on level of performance and need. [Emphasis added.]

>     \*     \*     \*     \*     \*     \*

> As envisioned, I believe this new position—Director of Ambulatory Services—will best meet St. Joseph's initiatives as well as the strategic direction of Ambulatory Services *over the next few years.* It is my hope that in assuming this position you will demonstrate vigor and enthusiasm in accomplishing our initiative. [Emphasis added.]

We disagree with the trial court's determination that the emphasized phrases "can reasonably be construed in more than one manner." First, it is undisputed that the letters exist and that they contain the above-quoted language. Thus, as in *Rowe,* "this is a situation in which the parties attach different meanings to undisputed facts...." 473 N.W.2d at 272. Viewing the emphasized phrases in the context of the entire letters, nothing in these writings promised Duncan that she could expect an indefinite term of employment; there are no assurances that might have instilled in Duncan any reasonable expectation of job security. The plain statements in DeSilva's letters do not overcome the presumption that Duncan's employment was terminable at will. At most, his letters contained aspirational expressions of his optimistic hope of a relationship of some duration of a kind which typically accompanies communications with employees. It is not expected that an employer underestimates the hopes it holds for an employee

**358**

assuming a new position for fear of nullifying a contractual relationship. *See id.* at 273 (quoting *Carpenter v. American Excelsior Co.,* 650 F.Supp. 933, 936 n. 6 (E.D.Mich. 1987)). Therefore, the phrases "the next several years" and "over the next few years" clearly refer to the duration of the position and not Duncan's expected tenure in that post.

As to Duncan's inferences from certain oral assurances, DeSilva's statements were consistent with the language of the above-referenced letters and do not rise to the level of an agreement providing Duncan a reasonable time in which to "prove" herself as the director of ambulatory services. Moreover, the other statements, which were self-serving, lacked any objective verification to permit a reasonable juror to find that a reasonable promisee would interpret the statements as an implied promise of termination only for cause. *Id.* at 274. Accordingly, there was no question of fact for the jury on this issue.

### ATTORNEYS' FEES

Pursuant to Arizona Revised Statutes Annotated section 12–341.01(A) and *Wagenseller,* 147 Ariz. 370, 710 P.2d 1025, the hospital asks that it be awarded its attorneys' fees incurred in pursuing this appeal. In the exercise of our discretion, we deny the request.

### CONCLUSION

Duncan failed to overcome the presumption that her employment at the hospital was terminable at will. Neither was there an implied-in-fact agreement that she would have a reasonable time in which to perform as director of ambulatory services nor that she only could be terminated from the hospital for cause. Given this conclusion, we need not address the hospital's remaining issues. We reverse the judgment and remand the matter to the trial court for the entry of judgment in favor of the hospital.

WEISBERG and VOSS, JJ., concur.