947 P.2d 846

**Dora HART, Dale Hart and Jeff Ernst, Plaintiffs–Appellants Cross Appellees,**

**v.**

**SEVEN RESORTS INC., a Nevada Corporation dba Temple Bar Resort, Defendant–Appellee, Cross Appellant.**

**No. 1 CA–CV 96–0187.**

Court of Appeals of Arizona, Division 1, Department C.

May 1, 1997.

Review Granted Dec. 16, 1997.

Brynne VanHettinga, Kingman, for Plaintiffs–Appellants Cross Appellees.

Gurtler, Kelley & Moyer by Kenneth E. Moyer, Bullhead City, for Defendant–Appellee Cross Appellant.

THOMPSON, Presiding Judge.

Plaintiffs (appellants) appeal from summary judgment for wrongful termination, breach of contract, breach of the covenant of good faith and fair dealing, promissory estop-

pel, invasion of privacy, intentional infliction of emotional distress, and false imprisonment by their former employer. Employer-appellee (Temple Bar) cross-appeals from the denial of attorneys' fees under Ariz.Rev.Stat. Ann. (A.R.S.) § 12–341.01(A). We affirm summary judgment on all wrongful termination counts and conclude that Arizona's constitutional provision guaranteeing the right to privacy does not support a public policy claim for wrongful termination. We remand on the appropriateness of an award of attorneys' fees in the trial court.

## FACTS AND PROCEDURAL HISTORY [1]

Appellants, three former at-will employees of Temple Bar, were terminated after refusing to take drug tests. At the time of their termination, appellants were working at the Temple Bar resort in the high desert of northwestern Arizona on Lake Mead. The nearest large metropolitan area is Las Vegas, Nevada, a drive of approximately one to two hours from Temple Bar. Because of the remote location, the Temple Bar employees live in low cost housing on company property.

All Temple Bar employees are provided a Personnel Policy Manual (the manual) stating that employment relationships are at-will and terminable by either party "with or with-

out cause or advance notice, at any time." The manual further states Temple Bar's policy (drug policy) prohibiting the use, possession, sale or distribution of any illegal drugs by employees while on company property. The manual provides that the use, possession, sale or distribution of illegal drugs "shall result in immediate termination...."

The drug policy announced in the manual specifies when employees are subject to drug testing.[2] Appellant Ernst signed a form acknowledging that he received a copy of the manual; the Harts signed a form acknowledging that they were expected to read, understand and adhere to the manual's provisions.

In addition to the drug policy announced in the manual, Temple Bar issued a "Drug Free Workplace Policy Statement and Employee Agreement" (drug-free agreement) to its employees in March 1993. Under the drug-free agreement, general managers could ask an employee to take a drug test "at any time." Violation of the testing policy or a failure to cooperate fully with a request for a test could result in disciplinary action, including termination. Again, appellants each signed the drug-free agreement acknowledging that

1. Appellants have not cited to the record in support of the facts in their opening brief as required by Ariz.R.Civ.App.P. 13(a)(4). Accordingly, we rely primarily on the statement of facts provided by the appellee. *See Bird v. State ex rel. Corbin,* 170 Ariz. 20 n. 2, 821 P.2d 287 n. 2 (App.1991) (citing *Flood Control Dist. v. Conlin,* 148 Ariz. 66, 68, 712 P.2d 979, 981 (App.1985)). We note later in this opinion where two factual disputes do arise. The disputed facts were considered by the trial court in the summary judgment ruling and determined to be immaterial to the result. We agree.

2. The manual in effect at the pertinent time provided:

**XIV. DRUGS AND ALCOHOL**
....
C. *Substance Abuse Testing and Inspection Policy.*
The company maintains a strict policy against the use of unlawful drugs while on duty, while on company premises, and while operating company equipment. To facilitate the administration and enforcement of the policy, the company may require or request that

job applicants and employees submit to drug or substance abuse testing under certain circumstances.
1. *Pre Employment Testing:*....
2. *Reasonable Suspicion Testing:*
In cases when an employee's supervisor or other company superior has reasonable suspicion to believe that the employee possesses or is under the influence of drugs and/or alcohol and such use or influence may adversely affect the employee's job performance, or the safety of the employee or coworkers, alcohol and/or drug screening may be ordered. This suspicion must be based on any objective symptoms, such as factors related to the employee's appearance, behavior, speech and/or other facts....
3. *Post Mishap Testing:*....
4. *Testing:*
Violation of this policy or failure to cooperate fully with any request to test may result in disciplinary action up to and including termination. The company will pay the full cost of any testing that it has requested of an applicant or employee, including the reasonable cost of any transportation to and from the designated testing facility.

they had read, understood and agreed to the policy.[3]

On February 24, 1994, Robert Clark (Clark), Temple Bar's Vice President of Operations, received a call from an employee. Clark was told that this employee, B.K., and four other employees had recently used drugs at Jeff Ernst's Temple Bar residence.[4] Clark was told that B.K. and appellants had discussed ways to defeat drug tests, including a substance that could be mixed with water to produce a "false negative" on a drug test. Clark was told that appellants had this substance available to them in their Temple Bar residences.

The next morning Vice President Clark contacted the lab Temple Bar used to conduct drug tests to inquire whether a substance existed which could produce a false negative. Clark was told that a false negative was possible and that employees should be required to submit to testing without the opportunity to drink anything first.

Clark then contacted Eddie Tomba (Tomba), Temple Bar's general manager, to have the four employees named by B.K. tested for drugs. On the morning of February 25, 1994, Tomba gathered up the four employees in a company van. T.M., who was picked up first, was told by Tomba that he was being taken for drug testing. T.M. knew that Temple Bar's drug testing was done in Las Vegas. Dale Hart was then picked up at work during his shift. Dora Hart was picked up at her company-owned residence and Ernst was picked up in a restaurant located on company property.

Tomba asserts he informed each employee, prior to their getting into the van, that they were being taken for drug testing. Appellants each admit voluntarily entering the van, but deny that Tomba told them they were going for drug tests until approximately ten minutes into the trip.

Tomba left Temple Bar with the four employees and headed for the test site in Las Vegas. On the main road to Las Vegas appellants informed Tomba that they refused to submit to drug testing and specifically asked Tomba to let them out at the Gold Strike Casino.[5] Tomba advised appellants that a refusal to submit to testing would result in termination. Tomba then stopped at the Gold Strike Casino, approximately 30 miles from the test site, and appellants exited the van. Subsequently, appellants were terminated and paid for the time spent traveling to the test site.

Appellants later filed a complaint against Temple Bar asserting causes of action for wrongful termination, breach of contract and promissory estoppel, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, invasion of privacy, and false imprisonment. After discovery, Temple Bar filed a motion for summary judgment. Appellants filed a response without a separate statement of facts. The court granted summary judgment on all counts.[6] Appellants timely appealed.

The court denied Temple Bar's motion for attorneys' fees under A.R.S. § 12–341.01(A) and Temple Bar cross-appeals the denial of its attorneys' fees. We have jurisdiction over this appeal pursuant to A.R.S. § 12–2101(B).

## DISCUSSION

### I. Wrongful Termination and the Constitutional Right to Privacy

■ In an at-will employment situation, either the employer or employee may termi-

---

3. Appellants assert that they were coerced into signing the drug-free agreement in order to receive paychecks for wages they had already earned. The trial court determined this was an unresolved issue, but not one of material fact.

4. Neither B.K., the informant, nor T.M., the fourth employee, are parties to this action; therefore we use initials to protect their privacy.

5. Appellants' interrogatories indicate that Ernst was the first to communicate that he would not be taking the drug test and that he asked Tomba to let him off at the Gold Strike Casino. The

Harts did not communicate their refusal to be tested until the van arrived at the Gold Strike Casino. The record reflects that the fourth employee, T.M., accompanied Tomba to the test site and tested negative for illicit drugs.

6. The ruling stated that only two contested facts existed: (1) *when* appellants were told by Tomba that they were going for drug testing; and (2) whether appellants were *coerced* to sign the drug-policy acknowledgements in order to receive their paychecks. The lower court found neither fact "material" to resolution of this matter. We agree.

nate the contract at any time for good cause or for no cause. *Wagenseller v. Scottsdale Memorial Hosp.*, 147 Ariz. 370, 378, 710 P.2d 1025, 1033 (1985) (reversing summary judgment against at-will employee who alleged she was fired, against public policy, for refusing to participate in arguably criminal conduct of "mooning"). Employers "may not fire for bad cause—that which violates public policy." *Wagenseller*, 147 Ariz. at 378, 710 P.2d at 1033. Public policy springs from constitutional, statutory, and common law. *Id.* at 378–79, 710 P.2d at 1033–34.[7]

Appellants assert that they were fired in violation of public policy arising from Arizona's constitutional right to privacy (right to privacy) for their failure to submit to drug testing.[8] We cannot find that Arizona's constitutional right to privacy provides the requisite public policy to support a wrongful termination suit against a private employer.

This court previously rejected a similar claim against a private party in *Cluff v. Farmers Ins. Exch.*, 10 Ariz.App. 560, 460 P.2d 666 (1969), *overruled by Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. 335, 783 P.2d 781 (1989).[9] In *Cluff*, one of plaintiff's allegations was that her constitutional right to privacy was violated when an insurance company adjuster cajoled her into settling her claim. We rejected her argument:

> This constitutional provision was not intended to give rise to a private cause of action between private individuals, but was intended as a prohibition on the State and has the same effect as the Fourth Amendment of the Constitution of the United States.

10 Ariz.App. at 563, 460 P.2d at 669. *Cluff* however decided only that the constitution did not provide a *direct cause of action* for invasion of privacy; *Cluff* did not address whether the constitutional right to privacy is a matter of public policy capable of supporting a cause of action for wrongful termination.

In favor of the expansion of the right of privacy, appellants cite cases which expand the provision beyond the search and seizure context. In *In re Rasmussen*, the supreme court held that a person has a limited right to refuse medical treatment under the right to privacy. 154 Ariz. 207, 215, 741 P.2d 674, 682 (1987). In *Weller v. Arizona Dep't of Econ. Sec.*, 176 Ariz. 220, 860 P.2d 487 (App. 1993), we cited the right to privacy in support of a holding that an employee, discharged after a drug test revealed trace amounts of marijuana in his system, was entitled to unemployment benefits. We stated:

> [The employer] ... relies on a generalized public policy against illegal drug use to justify its drug testing rule. *See* A.R.S. § 13–3405 (a person shall not knowingly possess, use, produce or sell marijuana). However, the unemployment compensation system also recognizes as a public policy protection of the off-duty personal lives of employees. *See* A.A.C. R6–3–5185(B). *See also* Ariz.Const. art. 2 § 8.

*Id.* at 227, 860 P.2d at 494.[10]

While some cases do hold that the right to privacy protects interests beyond the search and seizure context, appellants fail to appreciate a crucial distinction between their facts and the facts of those cases. However broad the federal constitutional right to privacy may be, it applies only to intrusions by

---

**7.** The Arizona Legislature has recently challenged this aspect of *Wagenseller*, proclaiming that "[c]ourts are not vested with the authority to create public policy of the state." Laws 1996, Ch. 140, § 1(B). The legislature stated that *Wagenseller* was correctly decided, but that the supreme court "lacked the authority to make such a holding under the Constitution of Arizona" and that "the court had no authority to create a cause of action." *Id.*, § 1(E). The legislature adopted a statute defining the public policy of this state and limiting the situations in which an employee may bring a wrongful termination suit. A.R.S. § 23–1501. The statute does not affect this appeal,

however, because this cause of action arose in 1994.

**8.** No person shall be disturbed in his private affairs, or his home invaded, without authority of law.
Ariz.Const. art. 2, § 8.

**9.** *Godbehere* overruled an aspect of *Cluff* that does not affect the appellants' argument here.

**10.** Appellants further cite *State v. Bolt*, 142 Ariz. 260, 689 P.2d 519 (1984), for the expansion of the right to privacy. We find this case unpersuasive as *Bolt* is a search and seizure case.

the *government* or where there is "state action." *See Rasmussen*, 154 Ariz. at 215 n. 9, 741 P.2d at 682 n. 9. "An individual successfully can assert his or her constitutional right to privacy only against governmental acts and not against acts of a private defendant unless 'state action' exists." *Id.* While *Rasmussen* addressed only the federal constitutional right to privacy, nothing in that opinion suggests the Arizona right applies against private individuals. *Id.* In fact, the court intimated that the two are linked by distinguishing the common law right to privacy from a right "emanating from constitutional penumbras." *Id.* at 216, 741 P.2d at 683.

Indeed, in the cases in which the right to privacy has been applied beyond search and seizure, it was applied against the government or where there had been "state action." In *Rasmussen*, the court tied the right to refuse medical treatment with state action, namely the authority to license and regulate healthcare professions and services and the state's supervisory authority over the guardianship of incapacitated persons. 154 Ariz. at 215 n. 9, 741 P.2d at 682 n. 9.

In *Weller* the state action was even more apparent: the question was whether the terminated employee qualified for unemployment compensation, a state benefit. *See* 176 Ariz. at 223, 860 P.2d at 490. In fact, *Weller* was carefully and narrowly written to be applied only in its specific context and explicitly warned against any attempt to extend it to the present context:

> Our opinion should not be read as requiring employers to retain workers who abuse drugs. The Legislature has not precluded employers from terminating employees who use drugs either on the job or off. Instead, it has merely protected the employee's right to receive unemployment compensation when the reason for the employee's termination was not demonstrably work-related. Misconduct justifying an employer in terminating an employee and misconduct disqualifying an employee from benefits are two distinct concepts. *In employment-at-will situations, an employee agrees to abide by the rules of his employer as a condition of employment. There-*
> *fore, an employee who violates the employer's rule may be terminated. Indeed, at-will employment may be terminated at the pleasure of either party with or without cause. Thus, an employer who terminates an at-will employee for failing a drug test ordinarily incurs no civil liability.*

176 Ariz. at 224, 860 P.2d at 491 (emphasis added) (citations omitted). Thus, *Cluff's* pronouncement that the right to privacy was intended to be a limitation only upon the state remains true, although the provision has been applied in a limited fashion beyond the search and seizure context.

Other arguments the appellants make, urging us to a more expansive interpretation of the privacy rights, are simply unpersuasive, primarily because their arguments do not relate to the *Arizona* right to privacy. Appellants' arguments concerning the California constitutional right to privacy actually cut against them; Article I, § 1 of California's Constitution was amended by voter initiative in 1972 to include a right to privacy. California's right to privacy has been interpreted to apply to intrusions by private entities. *Wilkinson v. Times Mirror Corp.*, 215 Cal.App.3d 1034, 264 Cal.Rptr. 194, 200 (1989); *Porten v. University of San Francisco*, 64 Cal.App.3d 825, 134 Cal.Rptr. 839 (1976). However, those California decisions are based on the ballot argument proffered in favor of the initiative, which specifically pointed to intrusions by private concerns, as well as the government.

There is nothing in the history of Arizona's Article 2, § 8 indicating a similar intent to protect citizens from private actors. Arizona's right to privacy was taken verbatim from the Washington constitution, and the records of the Arizona constitutional convention contain no material addressing its intent. *See* The Records of the Arizona Constitutional Convention of 1910 (John S. Goff, ed. [no date, Supreme Court of Arizona, publisher]). Washington's constitutional right to privacy does not constitute a clear mandate of public policy preventing an employer from terminating an employee for refusing to undergo a drug test. *Roe v. Quality Transp. Servs.*, 67 Wash.App. 604, 838 P.2d 128 (1992). The *Roe* court concluded that the privacy provi-

sion "creates a right to privacy, but in Washington this constitutional provision has been construed as a restraint on government and not a restraint on private individuals." 838 P.2d at 130. The same is true in Arizona.

Article 2, § 8 of the Arizona constitution does not restrict any private individual's actions, and it does not provide a clear mandate of public policy to support a cause of action for wrongful termination by a private individual. The trial court did not err in granting summary judgment on this claim.

## II. Breach of Contract: Personnel Policy Manual

■ Employment is a matter of contract; a personnel manual can modify an at-will relationship into one for a definite term. *Wagenseller*, 147 Ariz. at 381–82, 710 P.2d at 1036–37; *Leikvold v. Valley View Community Hosp.*, 141 Ariz. 544, 548, 688 P.2d 170, 174 (1984); *Duncan v. St. Joseph's Hosp. and Medical Center*, 183 Ariz. 349, 353, 903 P.2d 1107, 1111 (App.1995). Appellants argue that whether Temple Bar's manual became a part of their employment contract is a disputed question of fact. Appellants posit then that because the manual listed only three instances under which drug testing might occur, none of which they feel applied here, their termination breached the employment contract. We hold otherwise.[11]

An employer may prevent the personnel manual from turning an at-will relationship into one for a definite term by including language "that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason." *Leikvold*, 141 Ariz. at 548, 688 P.2d at 174. Temple Bar's manual does just that. In plain and common language, it dispels any idea that the employment contract is one for a definite term.[12]

In *Duncan*, this court reversed a jury verdict in favor of the plaintiff based on the disclaimer present in the defendant's handbook. The disclaimer language in this case is similar to that in *Duncan*. Summary judgment is granted under the same standard as a directed verdict or JNOV. *Orme School v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). Thus, there is no triable issue as to whether Temple Bar's manual became a part of appellants' employment contract, and summary judgment was proper.

■ Furthermore, appellants misapprehend the nature of the "policy manual exception" to the at-will doctrine. Modification of an at-will contract into one for a definite term "requires proof of an implied-in-fact *promise of employment for a specific duration.*" *Wagenseller*, 147 Ariz. at 376, 710 P.2d at 1031 (emphasis added); *Duncan*, 183 Ariz. at 353, 903 P.2d at 1111 (emphasis added). The appellants do not even assert that the manual's drug testing provisions gave them employment for a definite term.

**11.** The manual provides for testing upon being hired, upon "reasonable suspicion," and after a "mishap." Because of our disposition of this argument, we need not consider whether B.K.'s phone call provided Temple Bar with "reasonable suspicion" to test appellants. We also need not consider the application of Temple Bar's later-arising "drug-free" policy, which allowed testing "at any time."

**12.** In Section II, "HIRING/TERMINATION," the manual states:

B. *Termination at Will:* It must be remembered that the employment relationship is based on the mutual consent of the employee and Seven Crown Resorts. Accordingly, either the employee or Seven Crown Resorts can terminate the employment relationship at will, with or without cause or advance notice, at any time.
No employee or representative of Seven Crown Resorts, other than the President, has any authority to enter into any agreement for employment for any specified period of time or to make any agreement that is contrary to the employment-at-will policy. Further, the President of Seven Crown Resorts may not alter the at-will nature of the employment relationship unless he does so specifically in a written agreement signed both by the President and the employee.
Furthermore, the manual's "HANDBOOK ACKNOWLEDGEMENT FORM," signed by both Dale Hart and Dora Hart contained the following language immediately above their signatures:
Furthermore, I understand that employment with the company is not for a specified term and is at the mutual consent of the employee and the company. Accordingly, either the employee or the company can terminate the employment relationship at will, with or without cause, at any time.

Indeed, appellants specifically denied any definite employment term in their response to the motion for summary judgment:

> Plaintiffs are *not* claiming that Defendants' Personnel Policy Manual made any promises of job security or termination procedure; however, the Manual does provided [sic] a fairly detailed description of conditions under which employees would be tested for illegal drugs or alcohol. Defendant's [sic] articulated substance abuse policy could create employee expectations as to the scope and manner in which such policy was to be enforced.

Without a contract for a definite term, the employment was at-will, and the appellants cannot sue in breach of contract for being fired. The trial court properly granted the motion for summary judgment on the breach of contract claim.[13]

### III. Invasion of Privacy

Appellants next assert that summary judgment on their invasion of privacy claims should not have been granted. Appellants assert two tort causes of action under this rubric: one for intrusion upon their seclusion and one for false light.

#### A. Intrusion Upon Seclusion

■ · This court has recognized the four-part classification of the tort of invasion of privacy laid out in the Restatement (Second) of Torts §§ 652A, *et seq.* (Restatement); *Rutledge v. Phoenix Newspapers, Inc.,* 148 Ariz. 555, 556 n. 2, 715 P.2d 1243, 1244 n. 2 (App.1986), *overruled on other grounds, Godbehere v. Phoenix Newspapers, Inc.,* 162 Ariz. 335, 783 P.2d 781. The Restatement sets forth the tort of intrusion upon seclusion thus:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclu-

sion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement § 652B.

The Restatement illuminates the tort in its comments:

> The invasion may be by physical intrusion into a place in which the plaintiff has secluded himself, as when the defendant forces his way into the plaintiff's room in a hotel or insists over the plaintiff's objection in entering his home. It may also be by the use of the defendant's senses, with or without mechanical aids, to oversee or overhear the plaintiff's private affairs, as by looking into his upstairs windows with binoculars or tapping his telephone wires. It may be by some other form of investigation or examination into his private concerns, as by opening his private and personal mail, searching his safe or his wallet, examining his private bank account, or compelling him by a forged court order to permit an inspection of his personal documents.

Restatement § 652B, cmt. b. The Restatement places the following limit on the tort:

> The defendant is subject to liability under the rule stated in this Section only when he has intruded into a private place, or has otherwise invaded a private seclusion that the plaintiff has thrown about his person or affairs.

*Id.,* cmt. c. Appellants fail to explain how Temple Bar's demand that they take a drug test was an invasion of their seclusion, and instead appellants merely enumerate the inconveniences they experienced.[14] Appellants' "evidence" clearly does not even approach establishing the tort set forth by the

---

13. Appellants also argue that their termination violated the implied covenant of good faith and fair dealing. This claim is based on their assertion that their termination was against public policy. Having earlier rejected the wrongful termination claim, we reject this claim. The covenant of good faith and fair dealing does not protect at-will employees from "no cause" termination; tenure was never a term of appellants'

contract. *See Wagenseller,* 147 Ariz. at 385, 710 P.2d at 1040.

14. Dora Hart had planned to do errands for her mother-in-law. Dora Hart also complains that she did not have enough time to properly dress and groom before going into town. Jeff Ernst had arranged a private job, had planned to visit with friends and his girlfriend, and had planned to attend a concert later that night.

Restatement. Summary judgment was proper.

## B. False Light

■ Although appellants acknowledge that they were terminated for refusing to take a drug test, appellants claim they have been damaged by false rumors that they are drug users. This claim too fails.

A false light tort occurs where:

One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

(a) the false light in which the other was placed would be highly offensive to a reasonable person, and

(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Godbehere v. Phoenix Newspapers, Inc.*, 162 Ariz. at 338, 783 P.2d at 784 (quoting Restatement § 652E). Thus, the tort is established if the defendant knowingly or recklessly published false information or innuendo about the plaintiff that a reasonable person would find highly offensive. *Id.* at 340, 783 P.2d at 786.

The immediate issue here is whether summary judgment was inappropriately granted despite a lack of evidence that Temple Bar publicly revealed the reasons for appellants' termination and did so in such a manner as to depict the incidents in a false light. To establish the "publicity" element appellants rely completely on their own interrogatory answers asserting that there are rumors in the community that they are drug users.[15]

There being no Arizona law on point, we look to the treatment of the publicity element by the Restatement and other courts. Although Restatement § 652E does not define publicity, it refers us to the comments to § 652D [16] which state:

The form of invasion of the right of privacy ... depends upon publicity given to the private life of the individual. "Publicity" as it is used in this Section, differs from "publication" [for defamation purposes] ... which includes any communication by the defendant to a third person. "Publicity" on the other hand, means that the matter is made public, *by communicating it to the public at large, or to so many persons that the matter must be regarded substantially certain to become one of public knowledge.* The difference is not one of the means of communication which may be oral, written, or by any other means. It is one of a communication that reaches, or is sure to reach, the public.

... [I]t is not an invasion of the right of privacy ... to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or magazine, even of small circulation, ... or statement made in an address to a large audience, is sufficient.

(Emphasis added.)

Under a similar factual scenario, a Kentucky court affirmed summary judgment after employees, terminated for failing a polygraph test, brought a false light claim against their employer, saying:

"Publicity," in the false-light context, *requires more than the mere act of firing plaintiffs under circumstances which may result in gossip....* Rather, it requires the communication of the false impression that plaintiffs were dishonest employees, with knowing or reckless disregard for the falsity of the publicized matter. *For that to occur in the present case, plaintiffs must be able to show that [employer] communicated the reasons for plaintiffs' termination to members of the public.* There is no evidence to sustain such a contention.... *Plaintiffs have neither pleaded nor proved any "publicity" by [employer], other than the overt act of firing plaintiffs.*

---

**15.** Appellants' evidence is contradicted by the affidavit of an area resident who indicated that she had not heard any rumors about appellants.

**16.** As corrected in the Restatement (Second) of Torts Appendix §§ 588 to 707A (1989) at page 362; the original text of the Restatement contains an erroneous typographical reference to § 652C.

*Stewart v. Pantry, Inc.,* 715 F.Supp. 1361, 1369–70 (W.D.Ky.1988) (emphasis added). The *Stewart* court rightly noted that in small towns "news spreads quickly." *Id.* at 1370. In the same vein, the Fifth Circuit Court of Appeals said:

> The mere fact that some interested parties may have heard rumors from sources other than [the employee] ... is, without more, insufficient to meet the level of publicity required for a false light claim.

*Moore v. Big Picture Co.,* 828 F.2d 270, 274 (5th Cir.1987) (affirming summary judgment against employee who was falsely accused of giving information to a competitor company). We agree.

Appellants ask us to *infer publicity* on the theory that only they and Temple Bar knew the reason appellants were terminated.[17] We find such an inference insupportable.

We agree with a Pennsylvania court that evidence of false light publicity *"requires more than this type of unsubstantiated allegation." Kryeski v. Schott Glass Tech.,* 426 Pa.Super. 105, 626 A.2d 595, 602 n. 2 (1993) (emphasis added) (that co-worker told at least two other employees that plaintiff was "crazy" and "unstable" was insufficient evidence of publicity).

Endorsing appellants' position here would be tantamount to eliminating an element of the tort, namely, publication by defendant.[18] Appellants needed to produce evidence that would allow a *reasonable* juror to find in their favor on the issue to survive summary judgment. *Orme School,* 166 Ariz. at 309, 802 P.2d at 1008. Appellants did not do so and summary judgment was appropriately granted.[19]

## IV. False Imprisonment

Finally, appellants argue that material issues of fact preclude summary judgment on their false imprisonment claims. Appellants assert that, although they voluntarily entered the van, their consent expired at some point after entering the van and that they were subsequently constrained against their will.

False imprisonment requires proof that: (1) the defendant acted with intent to confine another person within boundaries fixed by the defendant; (2) the defendant's act resulted in such confinement, either directly or indirectly; and (3) the other person was conscious of the confinement or was harmed by it. Restatement § 35; *see Deadman v. Valley Nat'l Bank of Arizona,* 154 Ariz. 452, 457, 743 P.2d 961, 966 (App.1987); *Wisniski v. Ong,* 84 Ariz. 372, 376, 329 P.2d 1097, 1099 (1958); *Swetnam v. F.W. Woolworth Co.,* 83 Ariz. 189, 192, 318 P.2d 364, 366 (1957).

"The *essential element* of false imprisonment is the *direct restraint* of personal liberty or the freedom of locomotion." *Swetnam,* 83 Ariz. at 192, 318 P.2d at 366 (emphasis added). Here, appellants do not allege physical threats, abuse or intimidation of the type commonly seen in false imprisonment claims.

### A. Voluntary Consent

Appellants admit that they initially voluntarily consented to going for a ride. "Of course, it goes without saying that one who consents to being placed within a limited and enclosed space by the other is not legally confined." *Noguchi v. Nakamura,* 2 Haw. App. 655, 638 P.2d 1383, 1385 (1982) (citations omitted) (finding a car can be a place of confinement). Another court said:

> from persons in the community who had heard the rumors; affidavits by appellants denying that they discussed the termination, thereby starting the rumors themselves; or any *direct* allegation of actual publication (e.g. via newspaper, public announcement, etc.) by Temple Bar. This is not to say these items of evidence would necessarily have been dispositive in this or any other case.

**19.** Because our consideration of the publicity element is dispositive as to appellants' false light claim, we need not address the intent, offensiveness or falsity elements.

---

**17.** Appellants' supposition that only they and Temple Bar knew why they were terminated is tenuous at best. Our reading of the record shows that at least one other person, T.M., was present during the pertinent events and was in the van when appellants exited at the Gold Strike Casino. Equally tenuous is the unproven assertion that appellants would presumptively not have told anyone of the incidents.

**18.** The following examples are illustrative of the kinds of evidence which appellants might have introduced to help prove publication: affidavits

It is essential, however, that the restraint be against the plaintiff's will; and if he agrees of his own free choice to surrender his freedom of motion, as by remaining in a room or accompanying the defendant voluntarily, to clear himself of suspicion or to accommodate the desires of another, rather than yielding to the constraint of a threat, then there is no imprisonment.

*Herbst v. Wuennenberg*, 83 Wis.2d 768, 266 N.W.2d 391, 396 (1978) (quoting William L. Prosser, Handbook of the Law of Torts § 11, at 44 (4th ed.1971)(footnotes omitted)).

Appellants each admit to voluntarily entering the van driven by Tomba. Appellant Ernst physically left the van to drop off his car keys to his wife, despite being instructed to stay inside the van, and admits he voluntarily returned to the van.

■ Appellants admit they knew that they were going to Las Vegas within ten minutes of getting into the van and before leaving the Temple Bar access road.[20] They admit discussing during the ride the fact that they were being taken for drug testing and "who would call Mr. Clark and say something so terrible and untrue." Notwithstanding that appellants were told they would be fired if they refused to take the drug test,[21] at some point they told Tomba that they would not take the drug test that day and directed Tomba to let them out at the Gold Strike Casino. Appellants got out of the van at the Gold Strike Casino. No physical force was used or threatened. These facts are undisputed.

### B. Revocation of Consent

■ However, appellants claim that, at the time they entered the company van, Tomba indicated only that they were "going for a ride," that they had previously gone with Tomba on innocuous errands, and that they had no reason to know the intended destination on February 25, 1994 was a drug testing lab in Las Vegas. On these facts, the only remaining question concerns whether a reasonable juror could have found that appellants were falsely imprisoned from some midpoint on the road if, after voluntarily accompanying Tomba at first but then learning of the intended destination, appellants had determined not to continue on to Las Vegas for drug testing, thus subjectively negativing their initial, voluntary consent, but where this new mindset was not contemporaneously communicated to Tomba. We answer this question in the negative.

■ False imprisonment requires more than a plaintiff's feeling "mentally restrained" where "she was not physically restrained, she was not told she should not leave, no threats were made against her leaving, she made no attempt to leave, and she made no request for permission to leave." *Riggs Nat'l Bank v. Price*, 359 A.2d 25, 27 (D.C.App.1976) (woman using bank service); *see also Grayson Variety Store, Inc. v. Shaffer*, 402 S.W.2d 424 (Ky.1966) (shoplifting suspects); *Herbst v. Wuennenberg*, 266 N.W.2d at 396–97 (mailbox vestibule exit blocked).

In *Herbst v. Wuennenberg*, the court said of three men whose exit was blocked by a woman:

At a minimum, however, plaintiffs should have attempted to ascertain whether there was any basis to their assumption that their freedom of movement had been curtailed. False imprisonment may not be

---

20. The complaint, personally verified under oath by each appellant, averred that Dale Hart was told before he entered the van that he was to be tested for drugs and that he had agreed to be tested. Appellants later denied this.

21. The threat of job loss is insufficient to constitute a threat for purposes of false imprisonment. *See Faniel v. Chesapeake and Potomac Tel. Co.*, 404 A.2d 147 (D.C.App.1979). In *Faniel*, the plaintiff-employee admitted having unauthorized telephone equipment in her home against company policy and she consented to being driven by her supervisor to her home to retrieve the equip-

ment. Plaintiff Faniel's assertions that she did not *want* to go in the car with her supervisor, that she was denied the opportunity to call her husband, that she *did not consent* to a stop to pick up additional security personnel, that she was afraid of losing her job and being disciplined were not sufficient to support her claim of false imprisonment. We agree with the *Faniel* court's conclusion that "fear of losing one's job, although a powerful incentive, does not render involuntary the behavior induced." 404 A.2d at 152 (citing *Moen v. Las Vegas Int'l Hotel, Inc.*, 90 Nev. 176, 521 P.2d 370, 371 (1974)).

predicated upon a person's unfounded belief that he was restrained.

266 N.W.2d at 396–97.

In *Faniel v. Chesapeake and Potomac Tel. Co.*, 404 A.2d at 153, the District of Columbia Court of Appeals considered Mrs. Faniel's claim that when her job supervisor and a company security official, instead of transporting her to her home as she had expected, detoured to pick up another security officer, had falsely imprisoned her notwithstanding her initial assent to the trip and despite her failure to advise them that she did not consent to the detour. The court found no false imprisonment *as a matter of law*, despite Mrs. Faniel's testimony that she never consented to the detour ˙to pick up the other security officer, that she had expressed concern during the ride about the unfamiliar route, and that she had been repeatedly refused permission to call her husband *en route*. 404 A.2d at 149, 153. Mrs. Faniel did not object or manifest a desire to leave the car at the point that she discerned she was being taken somewhere other than where she assented to go, so as to negative her prior consent and convert her into an unwilling passenger. 404 A.2d at 153.

Similarly, although appellants may have objected to taking the drug tests, they did not manifest an objection to being in the van. Appellants did not attempt to leave the van or ascertain whether they were actually restrained.[22] The evidence shows that once appellants communicated their withdrawal of consent and directed Tomba to let them out at the Gold Strike Casino, Tomba complied. Appellants' theretofore unexpressed revocation of consent did not convert them into "unwilling passengers" or otherwise negative their initial consent.

When Temple Bar made its *prima facie* showing that it was entitled to summary judgment, appellants were required to affirmatively demonstrate a triable issue with specific facts. *Portonova v. Wilkinson*, 128

Ariz. 501, 502, 627 P.2d 232, 233 (1981). Appellants failed to do so. On these facts, given the voluntariness of the initial submission to the van "ride," there was no false imprisonment, and summary judgment was properly granted.

## V. Cross-Appeal: Attorneys' Fees

Temple Bar challenges the trial court's denial of attorneys' fees pursuant to A.R.S. § 12–341.01(A). Statutory fees may be awarded to a defendant who defeats a wrongful termination claim, if the claim arises out of contract. *Nelson v. Phoenix Resort Corp.*, 181 Ariz. 188, 201, 888 P.2d 1375, 1388 (App. 1994).

An award or denial˙ of fees pursuant to the statute will be reversed only for an abuse of discretion. *Wheel Estate Corp. v. Webb*, 139 Ariz. 506, 508, 679 P.2d 529, 531 (App.1983). The factors a court should consider in deciding a request under § 12–341.01(A) are:

1. The merits of the claim or defense presented by the unsuccessful party;

2. Whether the litigation could have been avoided or settled and the successful party's efforts were completely superfluous in achieving the result;

3. Whether assessing fees against the unsuccessful party would cause an extreme hardship;

4. Whether the successful party prevailed with respect to all of the relief sought;

5. The novelty of the legal question presented;

6. Whether the claim or defense had previously been adjudicated in Arizona;

7. Whether the award in any particular case would discourage other parties with tenable claims or defenses from litigating or defending legitimate contract issues for fear of incurring liability for substantial amounts of attorney's fees.        .

*Associated Indem. Corp. v. Warner*, 143 Ariz. 567, 570, 694 P.2d 1181, 1184 (1985) (citing

---

22. While appellants complain that, although their initial consent expired *en route*, they were not let out of the van until they were nearly to the test site, the fact is that appellants knew of the intended destination within minutes of leaving Temple Bar but did not communicate any withdrawal of consent until some mid-point on the road in the middle of nowhere where it was impractical that they be let out of the van immediately. Appellants requested to be let off at the Gold Strike and Tomba complied.

*Wistuber v. Paradise Valley Unified School Dist.*, 141 Ariz. 346, 687 P.2d 354 (1984) for factor number seven).

In the trial court, the appellants asserted, without providing any evidence, that they were "economically marginalized" and that this mitigated against an award of fees. The trial court denied fees without explanation. Temple Bar claims on appeal that appellants' allegation of relative poverty formed the basis of the trial court's denial of fees and points to this interchange between counsel and the court at oral argument:

> THE COURT: Okay. And just as a practical situation, Mr. Moyer, how collectable is this judgment going to be, assuming I grant your client's judgment against these various defendants?
>
> MR. MOYER: Well, Your Honor, that's something that neither myself—or really nobody's sure. I guess we can make a presumption and assume; perhaps, it's not, but we don't have any information to indicate one way or another.
>
> THE COURT: Well, I'm just thinking—you know, I don't remember reading the salary range of these people, but I'm kind of assuming it's closer to minimum wage than to the salary you're earning.
>
> My inclination, Mr. Moyer, is to deny the request for attorney's fees.

The denial of a request for attorneys' fees is subject to reversal if the trial court bases its ruling on unsupported factual claims. In *Woerth v. City of Flagstaff*, 167 Ariz. 412, 808 P.2d 297 (App.1990), the superior court denied the defendant's request for fees on the basis that an award would constitute a financial hardship on the plaintiff. We reversed and remanded for reconsideration because there was no evidence to support that supposition, only the unsworn statements of counsel. *Id.* at 420, 808 P.2d at 305.

If the appellants' economic status formed the basis of the trial court's ruling here, it would be subject to reversal, just as in *Woerth*. However, we cannot determine for certain, based on this record, that appellants' economic status drove the court's decision to deny fees because the trial court did not explain its ruling. The exchange quoted above occurred immediately prior to the actual arguments of counsel, and the court only stated at that time that it was "inclined" to deny the fees.

We reiterate that a better practice is for the superior court to explain its decisions:

> While trial judges generally are not required to give reasons for discretionary rulings, some explanation, however brief, greatly assists in appellate review, and may prevent unnecessary reversal where facts are close and support for a ruling is not patent from the record.

*City of Phoenix v. Geyler*, 144 Ariz. 323, 329 n. 3, 697 P.2d 1073, 1079 n. 3 (1985). This applies with some force in the context of discretionary rulings. *Hughes v. Hughes*, 177 Ariz. 522, 525, 869 P.2d 198, 201 (App. 1993).

It truly would have been better for the trial court to explain its rationale here, when Temple Bar was totally successful and it prevailed on all claims. We therefore remand to the trial court the issue of attorneys' fees pursuant to A.R.S. § 12–341.01(A).

■ In our discretion we decline Temple Bar's request for an award of attorneys' fees on appeal. The main issue involved here is novel: there are no reported Arizona cases addressing the application of Article 2, § 8 in a wrongful termination action against a private citizen. And while we have held in Temple Bar's favor, we do not find that the outcome was as preordained as Temple Bar asserts. Furthermore, we believe that awarding fees might discourage others from bringing meritorious claims asserting their constitutional rights. *See Wistuber*, 141 Ariz. at 350, 687 P.2d at 358. We deny Temple Bar's request for an award of attorneys' fees on appeal and remand on the appropriateness of an award of fees in the trial court.

## CONCLUSION

The summary judgment is affirmed on all counts. This case is remanded on the issue of attorneys' fees below.

KLEINSCHMIDT and GRANT, JJ., concur.