738 P.2d 1146

**Frank LOFFA, Plaintiff-Appellee,**

v.

**INTEL CORPORATION, a California corporation, Defendant-Appellant.**

**No. 1 CA–CIV 8810.**

Court of Appeals of Arizona, Division 1, Department C.

May 12, 1987.

Francis G. Fanning, Tempe, for plaintiff-appellee.

Snell & Wilmer by Robert J. Deeny, Daniel J. McAuliffe, Lonnie J. Williams, Jr., Rebecca A. Winterscheidt, Phoenix, for defendant-appellant.

OPINION

MILTON R. SCHROEDER, Judge Pro Tem.

This is an appeal from a judgment against appellant, Intel corporation, for breach of contract in terminating plaintiff-appellee Frank Loffa's employment with Intel. After the trial court denied Intel's motions for summary judgment and for a directed verdict, a jury returned a verdict in the amount of $68,400 against Intel. The trial court denied Intel's motion for a new trial and for judgment notwithstanding the verdict and entered judgment for Loffa in the amount of the verdict. Intel then brought this appeal. We affirm.

Frank Loffa was employed with Intel as an electrician technician from June, 1980, until November 9, 1981, when Intel discharged Loffa from employment. Loffa contends this discharge breached his employment contract with Intel. Intel's position is that this discharge was justifiable because, first, its employment relationship with Loffa was "at will" and could be terminated at any time for any reason; and second, if an employment relationship other than "at will" existed, Intel correctly observed all the procedures called for in its

disciplinary procedures to discharge Loffa for "gross misconduct." In this appeal, as in its motions described above, Intel contends it was entitled to judgment as a matter of law on both issues.[1]

The events that gave rise to Loffa's dismissal occurred on Wednesday, November 4, 1981. While Loffa was engaged in a work task with another employee, yelling back and forth in a mock-harassing, bantering manner, Jim Corbitt, an assistant supervisor, intervened and directed Loffa to stop telling his co-worker what to do. An argument developed between Loffa and Corbitt during which Loffa suggested that they "go outside." Corbitt put his hand on Loffa's shoulder saying they should go see their supervisor, Luther Disney, prompting a response from Loffa that he would "break Corbitt's head" if he did not take his hand off him. Corbitt reported the incident to Disney, who in turn notified Ann Nelson, a personnel administrator, of the matter. Both Disney and Nelson investigated the circumstances. Later the same day, Disney met with Loffa and suspended him until the investigation was completed. Nelson and Disney continued their consideration of the incident during the remainder of the week and involved other management officers of Intel in discussions about it. Nelson discussed it with her superior, Shirley Kerfoot, who was the personnel administration manager. Disney consulted with his supervisor, Ron Williams, and also spoke with Ed Booth who was Williams' boss. On Monday, November 9, 1981, Loffa met with Disney and Williams, and Disney told him he was dismissed. At Loffa's exit interview on Monday, Nelson recorded the reason for the discharge as "unacceptable conduct— threatening assistant supervisor."

When Loffa began employment with Intel, he signed a one-page form document entitled "Employee Agreement." This document obligated Loffa to work faithfully for Intel and required him to protect the trade secrets and other property of Intel. The key paragraph for the purposes of this litigation stated:

> 5. This Agreement (a) survives my employment by INTEL, (b) does not in any way restrict my right or the right of INTEL to terminate my employment, (c) inures to the benefit of successors and assigns of INTEL, and (d) is binding upon my heirs and legal representatives.

The document contained no reference to employee disciplinary procedures. It neither referred to other documents or policies as constituting part of the employment agreement nor excluded other documents or policies from the agreement. As part of the orientation for new employees, however, Loffa received a package of materials that included a document entitled "Our Procedures, Your Responsibility." This document had a section on "Employee Conduct" that stated:

> The company regards certain kinds of conduct as unacceptable. An employee who fails to meet normal work standards, takes extended breaks and lunches, does poor quality work, fails repeatedly to meet time commitments, or is unwilling to perform assigned duties, is performing unsatisfactorily. Supervisors will issue disciplinary warnings to give such an employee an opportunity to meet proper standards. The usual procedure is that an employee receives one oral warning, to be followed by one or two written warnings prior to dismissal; however, alcohol consumption, drug abuse, or engaging in gambling on Intel premises are strictly prohibited and will be cause for immediate termination.

> Theft, insubordination, being under the influence of alcohol or drugs, unwillingness to perform assigned duties, gross

---

1. Loffa has raised a number of cross-issues for consideration if the judgment is not affirmed. He argues the trial court should have permitted the jury to consider if Loffa's conduct constituted "just cause" for dismissal rather than directing the jury that the employer's characterization of the conduct as "severe misconduct" was conclusive; should have allowed plaintiff to explore the prior performance record of the assistant supervisor who was involved in the dispute to establish that the company had not dealt with Loffa fairly; and, should have instructed the jury that Intel had a contractual obligation to deal fairly and in good faith with Loffa. We do not reach these issues in light of our affirmance of the judgment.

carelessness, negligence of duties, falsification of work records, failure to observe safety regulations and altercations involving customers or other employees are examples of serious misconduct and are cause for disciplinary action up to and including termination.

The orientation package also included a two-page statement of "Welcome" which said:

We are proud that although Intel operates in many different parts of the world, none of our employees are represented by labor unions. We believe this means that Intel employes feel they get a "fair shake" without any need to involve outsiders.

The orientation for new employees included a verbal review of the company's disciplinary policy. The policy is stated in a company document entitled "Non Exempt Discipline Policy." The policy establishes a progressive disciplinary process for most cases that begins with a verbal warning, advances to written warnings, and then in the event of continued problems, can result in termination of the employee with the approval of the department manager and a personnel administrator. In addition, there is a category of conduct in the policy for which Intel may terminate an employee without prior warning. When there is "gross" or "severe" misconduct, the employee may be terminated without warnings, but in such a case the termination must have the approval of both the department manager and the personnel administration manager. The relevant section of the policy is ¶ 4.5.3 which defines "Gross Misconduct" as follows:

In cases of severe misconduct, an employee can be terminated without warnings. Approvals of the department manager and the personnel administration manager are required.

At the time of Loffa's dismissal, the personnel administration manager was Shirley Kerfoot, to whom Ann Nelson (a personnel administrator) reported. Loffa's department manager was Ron Williams, to whom Luther Disney reported.

The trial court instructed the jury that the basic contractual relationship between employer and employee was one of "employment-at-will," which could be terminated "by either party at any time for any reason or for no reason," but that the jury could find that "personnel manuals, employer policy statements and memoranda, as well as other employer actions can be regarded in fact as incorporated into and made a part of any employment contract." The court told the jury it was the jury's task to determine whether anything other than an employment-at-will relationship existed and, if it did, to then decide what constituted the contract of the parties. The jury could consider, in addition to the document entitled "Employee Agreement," the company's "Non Exempt Discipline Policy," the document entitled "Our Procedures, Your Responsibility," and "practices, customs and/or procedures applicable to the employment relationship." If the jury determined the employment was at will, the court directed the jury to enter a verdict for the defendant. If it found some other contractual relationship, the court instructed the jury to determine if Intel had breached the contract, but the court removed from consideration by the jury whether an altercation occurred. The instructions advised the jury Intel had "reserved the right to determine whether an 'altercation' between plaintiff and another employee occurred." The court further instructed that "such conduct could properly be regarded by the defendant employer as 'gross' or 'severe' misconduct ..." as used in ¶ 4.5.3 of the discipline policy.

I.

Intel argues the court could not permit the jury to consider if the company's personnel manual, discipline policy or other practices, created a termination procedure binding on Intel in its dealings with Loffa because the document entitled "Employee Agreement" which Loffa signed on entering employment constituted an express agreement that the employment relationship was "at will." The critical language in the agreement, in Intel's view, is ¶ 5 of the document which provides that "This

Agreement ... does not in any way restrict my right or the right of INTEL to terminate my employment...." Having agreed Intel shall not be restricted in terminating his employment, Loffa cannot look to other documents and practices of Intel to contractually limit his employer's ability to discharge him.

In *Wagenseller v. Scottsdale Memorial Hospital,* 147 Ariz. 370, 710 P.2d 1025 (1985) and *Leikvold v. Valley View Community Hospital,* 141 Ariz. 544, 688 P.2d 170 (1984), the Arizona Supreme Court considered the circumstances when employer disciplinary procedures reflected in personnel manuals, employer statements, and other employer practices modify what otherwise would be an employment-at-will relationship by limiting the employer's ability to terminate employment to the conditions established in the manuals, memoranda and practices. These two decisions require an affirmance of the trial court.

In *Leikvold,* the supreme court ruled that Arizona would not regard a contract of employment for an indefinite duration as a contract for employment-at-will as a matter of law. Finding an "at will" employment relationship was a matter of contract interpretation, not a substantive rule of law, which presented a question of fact on what constituted the terms of the employment agreement. Thus, the plaintiff employee in *Leikvold* was entitled to have a jury decide whether the terms of her employer's personnel manual became part of the terms of her employment contract. Likewise, in *Wagenseller,* the plaintiff employee was entitled to have a jury determine if her employer's personnel manual established an implied term that limited her employer's right to discharge her. In both cases, the court held the grant of summary judgment for the employer was error because there was a question of fact as to the terms of the employment. In both cases the employer argued, as does Intel, that the policies announced in the personnel manual did not constrain the employer's ability to discharge an employee for any reason or no reason at all. The supreme court rejected these arguments explaining

in *Leikvold,* in language repeated with approval in *Wagenseller,* as follows:

> Employers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason. Such actions, either not issuing a personnel manual or issuing one with clear language of limitation, instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual. However, if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it. Having announced a policy, the employer may not treat it as illusory.

*Wagenseller,* 147 Ariz. at 382–83, 710 P.2d at 1037–38 (quoting *Leikvold,* 141 Ariz. at 548, 688 P.2d at 174).

■ As both *Leikvold* and *Wagenseller* make clear, the provisions of the employer's personnel manual may create a term of the employment agreement without any showing of particular reliance on the manual by the employee, without any specific words incorporating the manual into the agreement, and notwithstanding that in other respects the employment relationship would be viewed as employment-at-will. *Wagenseller,* 147 Ariz. at 383, 710 P.2d at 1038; *Leikvold,* 141 Ariz. at 548, 688 P.2d at 174. Whether a personnel manual has modified the employment relationship is a question of fact "to be discerned from the totality of the parties' statements and actions regarding the employment relationship." *Wagenseller,* 147 Ariz. at 383, 710 P.2d at 1038. The jury may look to "[t]he employer's course of conduct and oral representations regarding the policy, as well as the words of the policy itself...." *Wagenseller,* 147 Ariz. at 383, 710 P.2d at 1038.

■ These teachings of *Leikvold* and *Wagenseller* aptly apply to Loffa's employ-

ment relationship with Intel. The evidence showed Intel encouraged employee reliance on its disciplinary procedures by its practices in the orientation of new employees which included reference to its disciplinary procedures in the written materials given new employees and verbal review of those procedures as part of the orientation. The language of the "Non Exempt Discipline Policy" itself contains nothing to alert an employee to place no reliance on the statements in that policy and to view such discipline policy as only a unilateral expression of employer intention that is subject to revocation or change at any time, in any manner, at the pleasure of the employer. To the contrary, the language of the policy and the conduct of Intel in adopting the policy and explaining it to its employees could properly be viewed by the jury as indicating that the policy was intended to be part of the employment agreement.

■ In our view, the general statement in the "Employee Agreement" that "[t]his Agreement ... does not in any way restrict my right or the right of Intel to terminate my employment ..." is not enough to remove the issue of the effect of Intel's "Non Exempt Discipline Policy" on the employment relationship from the jury's consideration. In the first place, even assuming the provision meets the "conspicuous" standard required by *Leikvold* and *Wagenseller*, the language of the agreement makes no reference to the discipline policy. The only reference is to *"[t]his* Agreement" (emphasis added), a reference that could reasonably be understood as limited to the document labeled "Employee Agreement" in order to make clear that employment could be terminated for reasons other than breach of the specific provisions of that document relating to protection of trade secrets, copyrights, and so forth. There is no express stipulation that the document labeled the "Employee Agreement" is the exclusive embodiment of the terms of the contract and forecloses both Intel and its employees from modification or supplementation of the terms of their relationship by further agreement either in a writing expressly assented to by the parties or in policy statements or other con-

duct of Intel; nor is the "Employee Agreement" document so comprehensive on its face in covering all aspects of the employment relationship as to compel the view that it impliedly excluded any modification or supplementation of the terms of that relationship. Given the instructions in *Leikvold* and *Wagenseller* that a notice should be "clearly and conspicuously" contained in the personnel manual itself in order to negate potential employee reliance, it is doubtful that even a more direct statement in the document titled "Employee Agreement" would be sufficient by itself to remove the issue of fact of what are the contract terms from the jury. But we need not decide that question because this provision of the Intel agreement is not stated so "clearly and conspicuously" as to justify the court's construing the employment contract as a matter of law. *See Leikvold,* 141 Ariz. at 548, 688 P.2d at 174.

Intel argues that its employment agreement differs from the agreements litigated in *Leikvold* and *Wagenseller* because the employment-at-will relationship was expressly created by a written agreement. From this Intel argues there can be no implied contract where the parties have expressly contracted with respect to the same subject matter. In advancing this position, Intel relies on *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453 (6th Cir.1986) as holding that there cannot be an implied contract restricting the at-will employment relationship where there is an express contract stating that the relationship may be terminated at will, with or without cause.

In *Reid,* a case decided under the law of Michigan, three former employees sued Sears for breach of contract claiming they were discharged without a showing of good cause. The federal court affirmed the entry of summary judgment for Sears. In that case, all of the employees had signed an application for employment that contained the following language:

> In consideration of my employment, I agree to conform to the rules and regulations of Sears, Roebuck and Co., and my employment and compensation can be terminated with or without cause, and

with or without notice, at any time, at the option of either the Company or myself. I understand that no store manager or representative of Sears, Roebuck and Co., other than the president or vice president of the Company, has any authority to enter into any agreement for employment for any specified period of time, or to make any agreement contrary to the foregoing.

*Reid,* 790 F.2d at 456. This language is significantly different from that in the Intel employment agreement. The Sears clause bluntly states that the employer reserved the right to discharge without cause or prior notice, but the Intel phrase is more ambiguous in referring only to an unelaborated "right of INTEL to terminate my employment." The Sears provision governs the entire employment relationship, but the Intel document may reasonably be read as having a narrower application because of the limited scope of the subjects referred to in the document and the express reference to "[t]his Agreement." The Sears document plainly contains an agreement on procedures that must be followed to amend the employment agreement and gives notice the agreement may be modified only in the limited circumstances where there is the approval of the president or vice president of the company, but the Intel clause is silent on this subject.[2]

Further, the emphasis in *Leikvold,* repeated with firm approval in *Wagenseller,* is that the nature of the employment relationship is a question of fact to be determined by the jury. When this is coupled with the supreme court's admonition in those cases that employers who issue policy manuals must exercise care to alert their employees through language "clearly and conspicuously" stated in the policy manual itself if it is intended that the policies are to have no binding effect, there is a substantial question whether even a statement with the specificity of that in *Reid* would meet the supreme court's conditions for when the factual issues of the nature of the contract may be kept from the jury. We need not decide this question on this record, but note it to make clear that our discussion of *Reid* should not be interpreted as accepting the *Reid* analysis.

■ The terms of the employment agreement are "to be discerned from the totality of the parties' statements and actions regarding the employment relationship." *Wagenseller,* 147 Ariz. at 383, 710 P.2d at 1038. Although Intel may have put the label, "Employee Agreement," on one of its documents, the affixation of this label does not avoid the need for a factual determination of what are the terms of the parties' agreement based upon all of their statements, representations, and course of performance. *See Leikvold,* 141 Ariz. at 548, 688 P.2d at 174. If there is a factual dispute as to whether one statement has been supplemented, modified, or contradicted by other actions of the parties, as was the case here, it is the jury's province to resolve it. Although the parties may have agreed tacitly or expressly that their relationship will have some of the characteristics of employment-at-will, the lesson of *Leikvold* and *Wagenseller* is that such an agreement is not inconsistent with a jury finding the parties also agreed to supplement or modify their employment contract in accordance with the employer's stated personnel policies and procedures. Thus, the trial court properly instructed the jury that it should decide what constituted the contract of the parties and could consider not only the document entitled "Employee

---

2. The importance of the specific language in the Sears application restricting the methods by which the agreement could subsequently be modified is shown by the court's discussion of another Michigan case, *Schipani v. Ford Motor Co.,* 102 Mich.App. 606, 302 N.W.2d 307 (1981). In *Schipani,* the employee had signed an agreement acknowledging that "my employment is not for any definite term, and may be terminated at any time, without advance notice by either myself or Ford Motor Company...." *Schipani,* 102 Mich.App. at 610, 302 N.W.2d at 309. The *Reid* court concluded the finding of a genuine issue of material fact as to whether there was reasonable reliance on policy statements of the Ford Motor Company was justifiable in *Schipani,* but not in *Reid,* because "[t]he Ford disclaimer did not provide that no employee of Ford other than the president or a vice president of the company could make a contrary agreement." 790 F.2d at 453.

Agreement," but also other documents of the company, such as the "Non Exempt Discipline Policy," and the company's customs and practices.[3]

Accordingly, we conclude that the trial court properly submitted to the jury the issue of whether Loffa's employment agreement with Intel included a term limiting the circumstances under which Intel could discharge Loffa to those where Intel followed the provisions of its "Non Exempt Discipline Policy" including ¶ 4.5.3.

## II.

■ Intel also argues that there was no evidence to support a judgment that it violated ¶ 4.5.3 of its discipline procedures in terminating Loffa. As indicated above, since the trial court ruled that the employer reserved the discretion to determine if Loffa's conduct amounted to "gross" or "severe" misconduct, the critical issue for the jury was whether the approvals of the department manager and the personnel administration manager had been obtained as that paragraph of the discipline procedures required.

Luther Disney, Loffa's immediate supervisor, and Ann Nelson, personnel administrator, were the Intel representatives most involved in the decision to terminate Loffa. Neither qualified to approve the action under ¶ 4.5.3. That policy called for the approval of Ron Williams, the department manager, and Shirley Kerfoot, the personnel administration manager. In requiring their approval, the procedures under ¶ 4.5.3 for termination without prior warning were different from the approvals needed for a dismissal in circumstances where the company had given prior warnings. As a personnel administrator, Ann Nelson could approve the personnel action in the latter case. There was testimony that the preponderant proportion of discharges were those that could be handled by the personnel administrator without higher authority, as well as other evidence to suggest Nelson and Disney might have thought the approvals under the more routine procedure were all that the discipline policy required.

Various Intel officials testified to the steps taken during the investigation of the Loffa matter and the participation of such officials in the final decision to terminate. Ann Nelson testified she discussed the matter with her superior, Shirley Kerfoot, on two occasions and obtained her approval for the dismissal. Shirley Kerfoot expressed her approval of the action. Luther Disney testified that Ron Williams gave Disney authority to take action. Disney and Ed Booth, Ron Williams' superior, testified that Booth had concurred in the action. Ron Williams was equivocal in relating his position indicating only that he "did

---

3. Intel's reliance on *Chanay v. Chittenden,* 115 Ariz. 32, 563 P.2d 287 (1977), also is misplaced. Intel points to language in that case which says, "[t]here can be no implied contract where there is an express contract between the parties in reference to the same subject matter." 115 Ariz. at 35, 563 P.2d at 290. This language has no application to the circumstances before us. First, the "implied contract" term the *Chanay* court refused to consider was not a term implied as a matter of fact from all the circumstances bearing on the intention of the parties as *Leikvold* and *Wagenseller* counsel, but was an "equitable theory" based in some fashion on the *Restatement of Contracts* § 90 that the appellant in *Chanay* argued would override as a matter of law even an unambiguous agreement to create an employment-at-will contract. Unlike the case before us, the appellant's difficulty in *Chanay* was that he could point to no facts indicating anything other than an employment relationship terminable at will. Second, *Leikvold* and *Wagenseller* require consideration of all the relevant circumstances, including the parties' representations and course of conduct, to ascertain the terms of the parties' agreement on how the employment relationship may be terminated; to the extent that *Chanay* rests on a notion that these representations and course of conduct cannot be so considered, *Leikvold* and *Wagenseller* discredit this reasoning. Third, the *Chanay* language does not address, much less suggest, any change in the well established principle that the existence of a writing which appears to express the parties agreement does not automatically foreclose a factual inquiry to establish what the terms of the contract are. Before a writing can be given such a preclusive effect, other determinations, which are not necessary for the purposes of this case to explore, must be made from all of the relevant evidence as to the parties' intentions. *See Reid,* 790 F.2d 453, and the discussion in note 2, *supra. See also Restatement (Second) of Contracts* § 209 comment c (1981) ("Whether a writing has been adopted as an integrated agreement is a question of fact to be determined in accordance with all relevant evidence."); *id,* §§ 210 and comment b, 212, 222, 223.

not disagree," and he recounted that on the Monday when the termination occurred he told Disney he would attend the meeting with Loffa but would not participate in it.

Loffa sharply attacks this record as inadequate to show approval by Williams, the department manager, and as raising credibility issues with respect to the testimony of the others. Specifically, Loffa argues the jury was entitled to disbelieve the Nelson-Kerfoot testimony of Kerfoot's approval because Kerfoot's involvement in the decision was limited to two conversations with Nelson with no independent investigation on her part; Kerfoot's name did not appear on the personnel action notification that is routinely processed when an employee is terminated; and Loffa testified that when he encountered Kerfoot several days after his discharge, Kerfoot professed ignorance of his firing. With respect to Booth, although Loffa made no issue as to Booth's ability as Williams' superior to supply the required authorization, Disney's explanation of Booth's approval could be viewed as indicating little more than acquiescence.[4] Because Booth bypassed Ron Williams, who was the direct supervisor of Loffa, to give approval to Disney, Loffa suggested the professional relationship between Booth, Williams and Disney raised an issue for the jury to consider as to Booth's motivations. Finally, the sequence and timing of the actions taken which began on Wednesday and extended until Monday could cast doubt on the testimony of the Intel officials, who have an interest in supporting the action taken by their employer, that the approvals occurred as recounted by the witnesses at the trial.

It is not our function to resolve the conflicts in testimony and issues of credibility. When the sufficiency of the evidence to support a judgment is questioned on appeal, an appellate court will examine the record only to determine whether substantial evidence exists to support the action of the court below. *Whittemore v. Amator,* 148 Ariz. 173, 175, 713 P.2d 1231, 1233 (1986). The credibility of the witnesses was properly for the jury to determine. *Worthington v. Funk,* 7 Ariz.App. 595, 442 P.2d 153 (1968). If a reasonable person could reach the verdict arrived at below viewing the evidence in the light most favorable to sustaining the verdict, the trial court's denial of a motion for judgment notwithstanding the verdict must stand. *Maxwell v. Aetna Life Ins. Co.,* 143 Ariz. 205, 211, 693 P.2d 348, 354 (App.1984).

Taking into account the credibility questions, there was sufficient evidence for the jury to conclude the proper approvals for Loffa's dismissal had not been obtained. First, as to Shirley Kerfoot, Loffa's testimony of her denial of knowledge of his dismissal supports his view that she never gave approval. There is additional support for this view from Kerfoot's limited participation in the decision making process and the evidence Nelson and Disney may have mistakenly thought higher approvals were not needed. Second, as to Ron Williams, Williams' own testimony about the degree of his involvement in the decision was sufficiently equivocal for the jury to conclude he did not approve. Third, although there was evidence of approval by Booth, the approval by him in substitution for that of Williams could be viewed as a departure from the company's normal procedures that a jury was entitled to question. Once again, the absence of signatures on the personnel action notice of the persons authorized to approve the dismissal could be interpreted as evidence those approvals had not been given.[5] Finally, of course, Kerfoot, Nelson, Disney, and Booth were all Intel employees at the time of the trial, and the jury was entitled to discount their testimony if it concluded this employment rela-

---

**4.** Disney testified to Booth's authorization for the dismissal as follows: "Well, he [Booth] said to me, 'It sounds to me like you have covered all the bases. You know what's going on and it sounds like the right thing to do.'"

**5.** Intel procedures provide for the initiation of a personnel action notice (PAN) in order to process an employee dismissal. The PAN for the Loffa dismissal was signed by Luther Disney

and a clerk on behalf of Ann Nelson. Although Loffa does not argue that ¶ 4.5.3 of the discipline policy requires written approval of the dismissal, the absence of signatures on the PAN of those authorized to approve the dismissal is some evidence in support of Loffa's view that the proper approvals were not obtained. In this regard, Williams testified the normal company procedure in terminations was for the depart-

tionship affected their credibility. *Graham v. Vegetable Oil Products Co.*, 1 Ariz. App. 237, 401 P.2d 242 (1965).[6]

### III.

Loffa has requested attorneys' fees on appeal pursuant to A.R.S. § 12–341.01. We grant this request and direct appellee to file an affidavit in compliance with Rule 21(c), Arizona Rules of Civil Appellate Procedure.

The judgment and rulings of the trial court are affirmed.

CORCORAN, P.J., and EUBANK, J., concur.

NOTE: The Honorable MILTON R. SCHROEDER was authorized to participate in this case by the Chief Justice of the Arizona Supreme Court pursuant to Ariz. Const. Art. VI, § 3 and A.R.S. §§ 12–145 to –147.

ment manager to sign the PAN but the form was never submitted to him in the Loffa matter and he had not authorized anyone else to act for him.

6. For the reasons given above, we also conclude there was no clear showing of abuse of discretion that would warrant reversal of the trial court's denial of defendant's motion for a new trial. *Adroit Supply Co. v. Electric Mut. Liab. Ins. Co.*, 112 Ariz. 385, 389, 542 P.2d 810, 814 (1975).