44 P.3d 164

Jerry C. ROBERSON and Jean M. Roberson, husband and wife, Plaintiffs–Appellees,

v.

WAL–MART STORES, INC., a Delaware Corporation; and Richard C. Wong, an individual, Defendants–Appellants.

No. 1 CA–CV 00–0555.

Court of Appeals of Arizona, Division 1, Department D.

April 23, 2002.

Treon, Strick, Lucia & Aguirre, P.A. by Arthur G. Newman, Jr., Gerald J. Strick, Teri K. Raven, Phoenix, Attorneys for Appellees.

Thomas & Elardo, P.C. by Benjamin C. Thomas, Neal B. Thomas, Phoenix, Attorneys for Appellants.

## OPINION

HALL, Judge.

¶1 Appellants Wal–Mart Stores, Inc. ("Wal–Mart") and Richard C. Wong ("Wong")[1] appeal from a jury verdict and judgment that Wal–Mart breached an implied contract when it terminated the employment of appellee Jerry Roberson ("Roberson"). We conclude that, as a matter of law, Roberson was an "at-will" employee and that the trial court therefore erred in denying Wal–Mart's motions for judgment as a matter of law ("JMOL"). Accordingly, we reverse.[2]

## FACTS AND PROCEDURAL HISTORY

¶2 On appeal from the denial of a motion for JMOL, "we view the evidence and all reasonable inferences in the light most favorable to the nonmoving party." *Murcott v. Best Western Int'l, Inc.*, 198 Ariz. 349, 356, ¶36, 9 P.3d 1088, 1095 (App.2000).

¶3 Roberson was first employed by Wal–Mart as a pharmacist-in-charge (pharmacy department manager) in October 1990 at its store in Claypool, Arizona. In 1991, he transferred to Wal–Mart's Apache Junction store, maintaining the pharmacist-in-charge position. He worked at the Apache Junction store until his termination on January 26, 1993.

¶4 As part of the employment process, Roberson signed an employment application that provided in relevant part:

I understand that this is not a contract for employment and that, even if employed, I will remain terminable-at-will and free to resign at any time I wish.

and

I ... understand that if hired I will be a "terminable-at-will" employee, and that my employment and compensation can be terminated with or without cause and with or without notice, at any time, at the option of either the company or myself. I further understand that no personnel recruiter or interviewer or other representative of the company other than the President of Wal–Mart Stores, Inc., or Vice President of Personnel has any authority to enter into any agreement for employment for any specified period of time.

¶5 Wal–Mart provided Roberson with a copy of the employee handbook given to all new employees, which he acknowledged reading. The first page of the handbook contained the following reservation:

The Company reserves the right to terminate any associate's employment at Wal–Mart's discretion. Furthermore, **nothing stated in this handbook or by any member of management is intended to create any guarantees of any certain disciplinary procedures.** ... Likewise, since you are not under contract, you are free to resign from the Company at any time.

(Emphasis supplied.) The handbook also contained the following disclaimers:

---

1. Wong was the district manager for Wal–Mart who terminated Roberson. As appropriate we refer to Wal–Mart and Wong collectively as "Wal–Mart."

2. This case is unaffected by Arizona's Employment Protection Act ("EPA"), Ariz.Rev.Stat. ("A.R.S.") § 23–1501, which became effective July 20, 1996.

We do not work under contracts at Wal–Mart. Employment depends on performance and the Company's needs.... If management determines a working relationship should be dissolved, it may be done totally at Wal–Mart's discretion. Likewise, you are not under contract and may resign from the Company at any time.

and

The Associate Handbook is not intended to create any contractual right in favor of you or the Company. The Company reserves the right to change any section of the Associate Handbook at any time.

¶ 6 The handbook also stated:

We strongly believe our associates do not need to be represented by a labor union, nor does the Company need unions to tell us how to run our business or handle our own personnel relations. We strongly believe:

"THERE IS SIMPLY NO NEED FOR A UNION AT WAL–MART"

and

At Wal–Mart, your manager or supervisor is your COACH. He or she is expected to help you learn how to do your job and to help you solve any problems which make it difficult to do your job. Your management team will work **with** you.

¶ 7 Because Roberson was the manager of the pharmacy department Wal–Mart also provided him with a Pharmacy Division Operations Manual. Portions relevant to the employer-employee relationship are:

### UNION POLICY

Wal–Mart strongly believes its associates do not need to be represented by a labor union, nor does the Company need unions to tell us how to run our business, or handle our own personnel relations.

\* \* \* \*

"There is simply no need for a union at Wal–Mart."

### HIRING AND TERMINATION OF ASSOCIATES

All hiring and terminations will be done according to the guidelines, policies and procedures set down by the Wal–Mart Personnel Department.

The hiring and termination of Pharmacy hourly associates will be the responsibility of the Pharmacy Manager. Proper disciplinary guidelines should be followed (See Positive Discipline).

¶ 8 Beginning in April 1992, Roberson participated in Wal–Mart's Pharmacy Manager's Bonus Plan, which enabled pharmacy managers to earn a yearly bonus payment based on the profitability of their stores. Paragraph 9 of the copy of the Bonus Plan signed by Roberson on April 5, 1992, provides:

This plan is not to be construed as a guarantee of employment for any specific period of time or any specific type of work but is presented to you to explain how your compensation will be calculated. This is not a contract and your employment with the Company is terminable-at-will by either you or the Company at any time.

¶ 9 Throughout Roberson's employment there, Wal–Mart used "Performance Coaching"[3] to improve associate behavior. The Wal–Mart Store Manual used in management training, instructed managers that:

Performance Coaching is a process to help associates correct and modify their behavior so they can continue their employment with us. Its purpose is to build better associates through feedback and coaching. Disciplinary actions must be applied in a fair, timely and consistent manner to be effective and to comply with the necessary legal requirements. Performance Coaching applies to Management associates as well as hourly associates. All management associates must be very familiar with this procedure, so that it may be properly applied.

Performance Coaching consists of four progressive steps: 1. coach and counsel, 2. verbal reminder, 3. written reminder, and 4. decision-making day. When an associate does not correct his or her behavior after

---

**3.** Performance Coaching is the same as Positive Discipline.

coaching, verbal and written reminders, then a decision-making day is used. A decision-making day is when the associate takes the next scheduled work day off with pay "to give the associate one more chance to determine if he/she wants to work for Wal–Mart." If an associate refuses to sign the written reminder form, then the supervisor should "[h]ave the associate go immediately on a Decision Making Day."

¶ 10 On January 25, 1993, Roberson argued loudly with an assistant store manager in front of customers over the amount of a coupon to give a customer who received a misfilled prescription. The next day, Wong met with Roberson to "coach" him concerning the incident pursuant to Wal–Mart's Performance Coaching process. Wong had prepared in advance a written plan for improvement that he asked Roberson to sign. Despite several requests, Roberson refused to sign the plan because it was prepared in advance of the meeting and he was too upset to sign it. As a result, Wong fired Roberson that afternoon. By firing Roberson without first giving him a decision-making day, Wong violated Wal–Mart's Performance Coaching procedures.

¶ 11 Roberson sued Wal–Mart for breach of an implied contract of employment, wrongful termination based on age discrimination, and breach of the covenant of good faith and fair dealing. He claimed damages for lost wages, lost bonuses, lost career opportunities, lost health and other benefits, and for emotional distress.

¶ 12 The trial court denied Wal–Mart's motion for summary judgment, and the matter proceeded to trial. At the close of Roberson's case, the trial court denied Wal–Mart's motion for a directed verdict,[4] subject to reconsideration at the close of Wal–Mart's case. At the close of all evidence, Wal–Mart renewed its motion for JMOL. The trial court granted Wal–Mart's motion as to the breach of the implied covenant of good faith and fair dealing claim; however, it permitted the breach of contract and wrongful termi-

nation claims to go to the jury. The jury returned a verdict in favor of Roberson on the breach of contract claim and awarded him damages in the amount of $257,958.[5] The trial court entered judgment for Roberson on the jury verdict.

¶ 13 Wal–Mart filed a post-trial motion for reneWal-of its motion for JMOL. The trial court denied Wal–Mart's motion, stating:

> A combination of statements made in the Employee Handbook and the Operations Manual could lead a reasonable juror to conclude that the employee, Plaintiff, reasonably thought he would not be terminated without performance coaching, including the cooling off day. Plaintiff knew about the Operations Manual because he was a supervisor in the Pharmacy Department. Other statements in the Employee Manual to the effect that a union was not needed, and that employees were aided through performance coaching to keep them on the job could be considered contrary to an at-will relationship.

Wal–Mart filed a timely notice of appeal.

## STANDARD OF REVIEW

■ ¶ 14 The test for granting a motion for JMOL is the same as that for granting a motion for summary judgment. *Orme School v. Reeves*, 166 Ariz. 301, 309, 802 P.2d 1000, 1008 (1990). The "motion should be granted if the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Id.*; Ariz. R. Civ. P. 50(a)(1) (providing for judgment as a matter of law when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue"). We review de novo the trial court's denial of a JMOL motion. *Shoen v. Shoen*,

4. Now known as JMOL. Ariz. R. Civ. P. 50.

5. The jury was given three options: find for Roberson on the breach of contract claim, find for Roberson on the age discrimination claim, or

find for Wal–Mart and Wong. After finding for Roberson on the breach of contract claim, it left blank the form of verdict on the age discrimination claim.

191 Ariz. 64, 65–66, 952 P.2d 302, 303–04 (1997).

## DISCUSSION

¶ 15 Generally, an employment contract of indefinite duration is terminable at will. *See, e.g., Wagenseller v. Scottsdale Mem'l Hosp.*, 147 Ariz. 370, 375–76, 710 P.2d 1025, 1030–31 (1985). As such, either party may terminate the contract at any time for good cause or no cause without incurring any liability. *Id.* at 375, 710 P.2d at 1030. It is undisputed that Roberson was not hired for a specific term, thus giving rise to a rebuttable presumption that his employment was terminable at will. *See id.* at 381, 710 P.2d at 1036.

¶ 16 Because an at-will employment relationship is contractual, however, "the parties are free to create a different relationship beyond one at will 'and define the parameters of that relationship, based upon the totality of their statements and actions.' " *Demasse v. ITT Corp.*, 194 Ariz. 500, 505, ¶ 12, 984 P.2d 1138, 1143 (1999) (quoting *Wagner v. City of Globe*, 150 Ariz. 82, 86, 722 P.2d 250, 254 (1986)). Limitations on the right of the employer or employee to terminate the employment relationship can be either express or implied. *Demasse*, 194 Ariz. at 505, ¶ 13, 984 P.2d at 1143. An implied-in-fact contract term is one that is inferred from the statements or conduct of the parties and becomes as enforceable as an express term. *Wagenseller*, 147 Ariz. at 381, 710 P.2d at 1036 (citing 1 Arthur L. Corbin, *Corbin on Contracts* § 17, at 38 (1960)).

¶ 17 In Arizona, implied-in-fact terms may be found in an employer's policy statements regarding job security or employee disciplinary procedures, such as those contained in personnel manuals or memoranda. *See, e.g., Leikvold v. Valley View Cmty. Hosp.*, 141 Ariz. 544, 546, 688 P.2d 170, 172 (1984); *Wagenseller*, 147 Ariz. at 382–83, 710 P.2d at 1037–38. Whether there is a promise of job security or certain disciplinary procedures implied-in-fact by an employer through its personnel manual or otherwise is a question of fact. *Leikvold*, 141 Ariz. at 548, 688 P.2d at 174 ("Evidence relevant to this factu-

al decision includes the language used in the personnel manual as well as the employer's course of conduct and oral representations regarding it."); *see also Wagenseller*, 147 Ariz. at 383, 710 P.2d at 1038.

¶ 18 Not all employer policy statements, however, create contractual promises. "A statement is contractual only if it discloses 'a promissory intent or [is] one that the employee could reasonably conclude constituted a commitment by the employer.' " *Demasse*, 194 Ariz. at 505, ¶ 15, 984 P.2d at 1143 (quoting *Soderlun v. Pub. Serv. Co. of Colo.*, 944 P.2d 616, 620 (Colo.Ct.App.1997)). "An implied-in-fact contract term is formed when 'a reasonable person could conclude that both parties intended that the employer's (or the employee's) right to terminate the employment relationship at-will had been limited.' " *Id.* (quoting *Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 778 P.2d 744, 746 (1989)). Disclaimers in personnel manuals that clearly and conspicuously tell employees that the manual is not part of the employment contract and that their jobs are terminable at will "instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual." *Leikvold*, 141 Ariz. at 548, 688 P.2d at 174.

¶ 19 The inclusion of disclaiming language in a personnel manual, however, may not always insulate the employer from liability. For example, contrary oral or written assurances made at a hiring interview or during employment may constitute an implied contract, altering the at-will relationship. *Wagner*, 150 Ariz. 82, 86 n. 5, 722 P.2d 250, 254 (1986); *see also Metcalf*, 778 P.2d at 747 ("Unless an employee handbook specifically negates any intention on the part of the employer to have it become a part of the employment contract, a court may conclude from a review of the employee handbook that a question of fact is created regarding whether the handbook was intended by the parties to impliedly express a term of the employment agreement.").

¶ 20 Wal–Mart argues that the court erred by denying its motions for JMOL made during and after trial because neither its disci-

plinary procedures (Performance Coaching) nor other statements contained in its employee handbook, pharmacy operations manual, or store manual created a reasonable expectation on Roberson's part that his employment was other than at-will. Wal–Mart relies primarily on the repeated disclaimers contained in Roberson's employment application and the employee handbook he was given at the time of his original employment in 1990, and on the further disclaimer contained in the Bonus Plan signed by Roberson in 1992.[6]

¶ 21 In *Hart v. Seven Resorts, Inc.*, 190 Ariz. 272, 278, 947 P.2d 846, 852 (App.1997), we applied *Leikvold* in holding that the employer prevented the personnel manual from converting an at-will relationship into one for a definite term by including a disclaimer in "plain and common language." The disclaiming language in *Hart* is very similar to that used by Wal–Mart.[7]

¶ 22 In *Duncan v. St. Joseph's Hospital & Medical Center*, 183 Ariz. 349, 354, 903 P.2d 1107, 1112 (App.1995), the employee handbook contained unambiguous language that Duncan's employment was terminable at will,[8] but also contained statements regarding job security and explained a "Performance Improvement Program" that guided supervisors in dealing with employee performance problems. We held that the handbook was not part of Duncan's employment contract because "[r]easonable persons could not find that the hospital's employee handbook ... instilled in Duncan any sensible expectations of job security or the belief that she could only be terminated for cause." *Id.* at 356, 903 P.2d at 1114. Here, in addition to the general at-will disclaimers similar to the disclaimer in *Duncan*, the employee handbook specifically informed Roberson that he was not entitled to "any certain disciplinary procedures."

¶ 23 Wal–Mart's position also finds support in cases from other jurisdictions that have found similar disclaimers sufficient to defeat an implied-in-fact contract claim as a matter of law. *See, e.g., Moser v. Coca–Cola Northwest Bottling Co.*, 129 Idaho 709, 931 P.2d 1227, 1229–31 (App.1997) (summary judgment for employer appropriate when employee signed documents acknowledging receipt of employee handbook, which stated "I acknowledge and agree that the Employee Handbook does not constitute a set of promises or an employment contract. I understand that my employment with [Corporation] will continue at the will of the Corporation and myself and may be terminated at any time for any reason by either party notwithstanding any statements in this Handbook or its subsequent revisions."); *Hrehorovich v. Harbor Hosp. Ctr., Inc.*, 93 Md.App. 772, 614 A.2d 1021, 1032 (1992)

---

6. At trial, Roberson did not claim he was unaware of these disclaimers. Rather, despite the fact that he also practiced law from 1978–85, he testified he did not understand what they meant.

7. The manual in *Hart* stated, in part:

> Termination at Will: It must be remembered that the employment relationship is based on the mutual consent of the employee and Seven Crown Resorts. Accordingly, either the employee or Seven Crown Resorts can terminate the employment relationship at will, with or without cause or advance notice, at any time. No employee or representative of Seven Crown Resorts, other than the President, has any authority to enter into any agreement for employment for any specified period of time or to make any agreement that is contrary to the employment-at-will policy. Further, the President of Seven Crown Resorts may not alter the at-will nature of the employment relationship unless he does so specifically in a written agreement signed both by the President and the employee.

The manual also included a "HANDBOOK ACKNOWLEDGMENT FORM," signed by the Harts containing the following language:

> Furthermore, I understand that employment with the company is not for a specified term and is at the mutual consent of the employee and the company. Accordingly, either the employee or the company can terminate the employment relationship at will, with or without cause, at any time.

*Id.* n. 12.

8. The disclaimer provided:

> This handbook, and the rules and policies set forth in it, do not constitute an employment contract. Employment at St. Joseph's is "at will"—which means that employment here is voluntary, both for you and for the Hospital. Either you or the Hospital may terminate the relationship at any time, with or without cause. Your work at St. Joseph's shall be free from any contracts or promises, written or oral, which may have induced you to come with us or to stay with us.

(employee may not reasonably rely upon termination procedures in policy manual when introductory portion of manual contained the following language: "This manual does not constitute an express or implied employment contract and nothing in the manual is intended to bind [the employer] contractually. Each employee's employment is terminable at will, so that both the [employer] and each employee remain free to choose to end their work relationship."); *Eliel v. Sears, Roebuck & Co.*, 150 Mich.App. 137, 387 N.W.2d 842, 843 (1987) (summary judgment for employer appropriate when application contained a disclaimer that employment could be "terminated, with or without cause, and with or without notice, at any time, at the option of either the Company or myself"); *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1003 (Utah 1991) (employment manual declaring that employment was "for no set period and may be terminated without notice and at will at any time by you or the company" could be interpreted only to mean that the employer's intent was to retain the right to discharge for any reason and that termination procedures in handbook must be read in light of disclaimer). *See generally* George L. Blum, Annotation, *Effectiveness of Employer's Disclaimer of Representations in Personnel Manual or Employee Handbook Altering At Will Employment Relationship*, 17 A.L.R.5th 1 (1994).

¶ 24 Citing *Loffa v. Intel Corp.*, 153 Ariz. 539, 738 P.2d 1146 (App.1987), and *Jeski v. American Express Co.*, 147 Ariz. 19, 708 P.2d 110 (App.1985), Roberson claims that even the clear-sounding disclaiming language in this case, when combined with the inconsistent statements and actions by Wal–Mart, is insufficient to defeat an implied-in-fact contract claim as a matter of law. We disagree.

¶ 25 In *Loffa*, the employee signed a one-page form entitled "Employee Agreement" that contained a statement in paragraph five

that read, in part, "This Agreement ... does not in any way restrict my right or the right of INTEL to terminate my employment...." 153 Ariz. at 541, 738 P.2d at 1148. We held that this language did not prevent the disciplinary procedures referenced in other materials given to new employees from being considered part of the employment agreement and ruled that the trial court properly denied Intel's motions for summary judgment, directed verdict and judgment notwithstanding the verdict. *Id.* at 543–46, 738 P.2d at 1150–53.

¶ 26 *Loffa* is distinguishable from the present case, however. First, unlike the employee handbook Wal–Mart provided Roberson, the agreement in *Loffa* did not include a specific disclaimer regarding disciplinary procedures. *Id.* at 543–44, 738 P.2d at 1150–51. Second, the relevant provision of the agreement in *Loffa*, a rather indirect statement tucked away in paragraph five and arguably limited to the document itself by the words "[t]his agreement," was not stated so "clearly and conspicuously" as to justify the trial court's construing the contract as a matter of law. *Id.* at 544, 738 P.2d at 1151.

¶ 27 In contrast, the disclaimers in this case are clear and comprehensive to the point of redundancy. Indeed, the *Loffa* court contrasted the language in the agreement before it with that in *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453 (6th Cir.1986), in which the Sixth Circuit, applying Michigan law, affirmed entry of summary judgment for Sears based on a disclaimer in an employment application containing language nearly identical to that in the Wal–Mart employment application. *Id.* at 544–45, 738 P.2d at 1151–52;[9] *see also East v. Bullock's Inc.*, 34 F.Supp.2d 1176, 1185 (D.Ariz.1998) (distinguishing *Loffa*).

¶ 28 In *Jeski*, language in the personnel manual providing that employment "can be terminated at any time by either the Compa-

---

9. The application for employment in *Reid* provided, in part:

In consideration of my employment, I agree to conform to the rules and regulations of Sears, Roebuck and Co., and my employment and compensation can be terminated with or without cause, and with or without notice, at any time, at the option of either the Company or

myself. I understand that no store manager or representative of Sears, Roebuck and Co., other than the president or vice president of the Company, has any authority to enter into any agreement for employment for any specified period of time, or to make any agreement contrary to the foregoing.
790 F.2d at 456.

ny or yourself," 147 Ariz. at 20, 708 P.2d at 111, was arguably inconsistent with other language in the manual "purport[ing] to make a number of assurances of fair treatment, personal respect, and significantly, job security." *Id.* at 22, 708 P.2d at 113. We held that whether the personnel manual could reasonably be construed to have modified the employment-at-will relationship was a jury question. *Id. Jeski* is also distinguishable from the present case, however, because American Express conceded that the policies expressed in the manual were part of its employment contract with Jeski, *id.* at 21, 708 P.2d at 112, the very point at issue here. As properly understood, *Jeski* is actually a case involving the interpretation of ambiguous, but admitted, contract terms rather than one involving contract formation.

▉▉▉▉ ¶ 29 Regardless of the precedential value of *Loffa* and *Jeski,* if the multiple disclaimers in this case do not satisfy *Leikvold's* "clear and conspicuous" requirement, 141 Ariz. at 548, 688 P.2d at 174, we can envisage none that would. It is undisputed that Roberson signed three disclaimers and read an employee handbook, all of which clearly stated that his employment was at-will. Further, the handbook provided, "nothing stated in this handbook or by any member of management is intended to create any guarantee of any certain disciplinary procedures." Given these disclaimers, it is inconceivable that Wal–Mart intended, or that Roberson could have reasonably interpreted, the statements in the handbook or the performance coaching provisions in the pharmacy operations manual and store manual as an

offer from Wal–Mart to limit its right to terminate Roberson's at-will employment. A contract to discharge only for cause must be based on more than an employee's subjective expectation. *Taylor v. Graham County Chamber of Commerce,* 201 Ariz. 184, 195, ¶ 45, 33 P.3d 518, 529 (App.2001); *see also Reid,* 790 F.2d at 460.[10]

¶ 30 Because the provisions in the handbook, pharmacy operations manual, and store manual were "neither a promise nor a statement that could reasonably be relied upon as a commitment," *Demasse,* 194 Ariz. at 505, ¶ 15, 984 P.2d at 1143 (citation omitted), they did not become part of Roberson's employment contract with Wal–Mart. Therefore, the trial court erred when it denied Wal–Mart's motions for JMOL.[11]

## CONCLUSION

¶ 31 The trial court erred in denying Wal–Mart's motions for JMOL. We reverse the judgment, including the award of attorneys' fees and costs to Roberson, and remand the matter to the trial court for the entry of judgment in favor of Wal Mart.

CONCURRING: EDWARD C. VOSS, Judge.

WEISBERG, Presiding Judge, dissenting.

¶ 32 I respectfully dissent.

¶ 33 The majority has articulated a reasonable rule of law: that a clear and unambiguous statement that the employment relationship is terminable at will negates any contradictory promises or policies adopted

---

**10.** Our dissenting colleague observes that, under *Leikvold,* 141 Ariz. at 548, 688 P.2d at 174, an employer who "chooses to establish a policy or procedure, through a manual or otherwise, and by its language or actions encourages reliance thereon, [] is no longer free to selectively abide by it." *Infra* ¶ 39. This proposition provides proper guidance, however, only if examined in the context in which it appears in *Leikvold:*

> Employers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason. Such actions, either not issuing a personnel manual or issuing one with

clear language of limitation, instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual. However, if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it.

*Id.* Clearly, *Leikvold* instructs us that an employee may not reasonably rely on a personnel manual that contains "clear language of limitation," which is precisely the situation here.

**11.** Because of our disposition of this issue, we do not address Wal–Mart's additional claim regarding materiality.

by the employer. While such a rule may be convenient in application, I believe it contradicts the precedent established by our supreme court.

¶ 34 In Arizona, "[a]n implied-in-fact contract term [may be] formed when a 'reasonable person could conclude that both parties intended that the employer's (or the employee's) right to terminate the employment relationship at-will had been limited.' " *Demasse,* 194 Ariz. at 505, ¶ 15, 984 P.2d at 1143 (internal citation omitted). Evidence relevant to the factual determination of whether an at-will employment relationship has been modified "includes the language used in the personnel manual *as well as the employer's course of conduct and oral representations regarding it." Leikvold,* 141 Ariz. at 548, 688 P.2d at 174 (emphasis added). Thus, the trial court is not at liberty to base its decision on the language of the disclaimer alone, but must consider the entirety of circumstances to determine whether an at-will employment contract has been modified. Furthermore, if contradictory and conflicting promises by an employer exist, doubt naturally arises about the resulting employment terms.

¶ 35 The majority, unfortunately, overlooks how such doubt is to be resolved. It correctly attributes *Leikvold* as directing that conflicting evidence be sent to the trier-of-fact, but then ignores that mandate. *See id.* ("Whether any particular personnel manual modifies any particular employment-at-will relationship ... is a question of fact."); *see also Wagenseller,* 147 Ariz. at 383, 710 P.2d at 1038 ("[T]he determination whether in a particular case a promise should be implied in fact is a question of fact."); *accord Wagner,* 150 Ariz. at 86, 722 P.2d at 254; *Loffa,* 153 Ariz. at 543, 738 P.2d at 1150.

¶ 36 The majority points to the clarity of the disclaimer, stating that "if the multiple disclaimers in this case do not satisfy *Leikvold's* 'clear and conspicuous' requirement, ... we can envisage none that would." *Supra* ¶ 29. While it is true that for a disclaimer to have a binding effect it must be clear and conspicuous, *see Leikvold,* 141 Ariz. at 548, 688 P.2d at 174, the inquiry does not stop there. Where a disclaimer, no matter how clear or conspicuous, is contradicted by another document or policy of the employer, it is for the trier-of-fact to determine whether that document or policy negates the disclaimer.

¶ 37 Judgment as a matter of law is appropriate only if "the facts produced in support of the claim or defense have so little probative value, given the quantum of evidence required, that reasonable people could not agree with the conclusion advanced by the proponent of the claim or defense." *Orme School,* 166 Ariz. at 309, 802 P.2d at 1008. The majority argues that, given the disclaimers presented to Roberson, it is inconceivable that the contradictory provisions in the employee manuals could be reasonably interpreted as a limitation to Wal–Mart's right to terminate Roberson's employment at will.

¶ 38 If we were confronted only with the written terms of the manuals, I would concur. However, the Performance Coaching process set forth in the employee manual was backed by a uniform and consistent policy that could be interpreted by a reasonable person as a promise that an employee would not be terminated without a decision-making day. For example, the pharmacy operation manual notes that all terminations are to be done in accordance with the guidelines, policies and procedures of the Wal–Mart personnel department, and be carried out in compliance with the Performance Coaching process. Also, the testimony of Wal–Mart's regional and district managers established Wal–Mart's expectation that the Performance Coaching process always be followed when the termination of an employee was contemplated. Roberson was aware of these policies and professed an expectation that he was entitled to their application. While reliance is neither dispositive nor an essential predicate to the action, it is one of several relevant factors. *See Wagner,* 150 Ariz. at 86, 722 P.2d at 254. In submitting the question to the jury, the trial court concluded that the dissemination of the Performance Coaching policy, Wal Mart's admitted intent that it be applied in all terminations, and Roberson's reliance upon it, when balanced against the disclaimer, could lead to differing conclusions

or inferences in reasonable minds. I do not find this conclusion to be in error.

¶ 39 An employer is free to maintain an at-will employment relationship with its employees, to issue no handbook, or to issue one that uncontradictorily informs his employees that their employment is terminable at will. *See Leikvold*, 141 Ariz. at 548, 688 P.2d at 174. However, once an employer chooses to establish a policy or procedure, through a manual or otherwise, and by its language or actions encourages reliance thereon, he is no longer free to selectively abide by it. *Id.* "Having announced a policy, the employer may not treat it as illusory." *Id.*

¶ 40 Here, there was sufficient evidence that the Performance Coaching process was such a uniformly and universally applied store policy that Wal–Mart's employees could reasonably have expected that it would be applied to them. It was therefore appropriate to send the matter to the jury. Because the matter was properly sent to the jury, and because there was sufficient evidence for the jury to find that, through its actions and statements, Wal–Mart had modified the at-will nature of its employment contracts, I would affirm.